222 F.3d 570 (9th Cir. 2000)
 JERRY RICHARD JENSEN, Plaintiff-Appellant,
v.
LANE COUNTY; RICHARD SHERMAN, individually and in his official capacity; PEACEHEALTH, a non-profit corporation of the State of Washington; SACRED HEARTGENERAL HOSPITAL; DOUGLAS PUTSCHLER, Defendants,
and
JEFFREY M. ROBBINS, M.D., Defendant-Appellee.
 No. 98-35866
 
 Office of the Circuit Executive
 U.S. Court of Appeals for the Ninth Circuit
 Argued and Submitted March 9, 2000--Portland, Oregon
Filed August 23, 2000
 [Copyrighted Material Omitted]
 Susan R. Pease, Harrison & Pease, Eugene, Oregon, for the plaintiff-appellant.
 Ruth Casby Rocker, Hoffman, Hart & Wagner, Portland, Oregon, for the defendant-appellee.
 Appeal from the United States District Court for the District of Oregon, Michael R. Hogan, Chief Judge, Presiding; D.C. No. CV 96-06101-JPC
 Before: Alfred T. Goodwin, Susan P. Graber, and Raymond C. Fisher, Circuit Judges.
 GOODWIN, Circuit Judge:
 
 
 1
 Jerry Richard Jensen filed an action for damages pursuant to 42 U.S.C. S 1983 for unlawful arrest and restraint against Lane County, certain officials, a hospital, and a private medical practitioner, Jeffrey M. Robbins, M.D. The district court granted summary judgment in favor of Dr. Robbins, and the other defendants went to trial, where the jury found in their favor. The only issue on this appeal is whether Dr. Robbins was entitled to summary judgment.
 
 PROCEDURAL HISTORY
 
 2
 The magistrate judge to whom the motion for summary judgment was assigned based his recommendation on two alternative grounds. First, he concluded that the doctor's conduct in signing a commitment order did not constitute "state action." For reasons that will be developed below, that was incorrect. In the alternative, the magistrate judge concluded that, if Dr. Robbins' conduct was state action, Dr. Robbins was entitled to qualified immunity. The district court adopted the magistrate judge's recommendation and later denied Jensen's motion to reconsider.
 
 FACTUAL HISTORY
 
 3
 Shortly before midnight April 15, 1995, Jensen was arrested for "menacing with a firearm" after he pointed a gun out of his car window at a pedestrian. Officers apprehended Jensen and deemed it necessary for their safety to handcuff him. The officers found a loaded automatic handgun and an open can of beer in the vehicle. Jensen was uncooperative, smelled of alcohol, and had an unsteady gait. Jensen told the officers he was taking various medications for conditions including depression. Jensen was booked at the Lane County adult corrections facility ("LCAC").
 
 
 4
 On April 17, two days after the arrest, Richard Sherman, a senior mental health specialist employed by Lane County, received information from the jail that Jensen's work supervisor, Putschler, who was also a county employee, had called to report serious concerns about Jensen's recent behavior, which included: bringing a gun to work, commenting empathetically about "post-office" shootings by disgruntled employees, and drinking alcohol. Putschler reported that co-workers had felt threatened by these actions. Putschler's report resulted in his being named as one of the defendants who was later exonerated by the jury.
 
 
 5
 Sherman reviewed Jensen's arrest documents and other jail information and met with Jensen. After this meeting, and in light of the information previously obtained, Sherman concluded that probable cause existed to believe that Jensen was a danger to himself or others because of depression, paranoia, and alcoholism.Pursuant to his belief that he had a statutory duty to do so, Sherman brought the Jensen case to the attention of Dr. Robbins, a contract psychiatrist affiliated with a private group called Psychiatric Associates ("PA"), and consulted with Dr. Ekanger, a senior mental health specialist employed by Lane County. Sherman recommended that Jensen be held at Lane County Psychiatric Hospital ("LCPH") for evaluation.
 
 
 6
 LCPH is a county facility that has a contract with private Sacred Heart General Hospital ("SHGH") under which the hospital provides administration and hospital staff to the county. On April 17, relying on police reports and the information obtained from Sherman, but without personally examining Jensen, Dr. Robbins signed the order detaining Jensen for evaluation pursuant to Oregon Revised Statute 426.232.
 
 
 7
 On April 18, 1995, Dr. Robbins took a history and performed a physical examination of Jensen. Dr. Robbins' notes from that day indicate a diagnosis of "Major depression in remission with Zoloft," alcoholism, and a "probable paranoid personality disorder." Jensen did not cooperate in the examination, so Dr. Robbins again relied heavily on police reports and information obtained from Sherman in deciding to continue Jensen's detention pursuant to Or. Rev. Stat.S 426.232, which permits temporary mental health detention for a period not to exceed five judicial days. Thereafter, Dr. Robbins saw Jensen briefly on each of the next three days.
 
 
 8
 While Jensen was at LCPH, Dr. Ekanger conducted an investigation to determine whether to pursue statutory involuntary commitment proceedings before the court. Dr. Ekanger concluded that there was insufficient evidence to proceed. Dr. Robbins agreed that Jensen was no longer mentally ill and should be released. Dr. Robbins' notes state: "No evidence of mental illness seen during stay here. No dx made. MMPI [a psychological test] not yet available. D/C [discharge] to LCAC [the jail]."
 
 
 9
 Jensen was released from LCPH on April 21, 1995 (the fifth day of his detention for evaluation). Dr. Robbins told Jensen at that time that he (Dr. Robbins) had been prepared 000to release Jensen "a couple of days ago."
 
 
 10
 Jensen then filed this action pursuant to S 1983 alleging that Dr. Robbins and the other named defendants had violated his constitutional rights by ordering him admitted to LCPH without due process of law. Jensen also asserted, remembering Dr. Robbins' comment at the time of his release, that the defendants violated his rights by continuing his involuntary detention beyond the reasonable time when the defendants, including Dr. Robbins, could no longer have had probable cause to detain him. Because Dr. Robins had been removed as a defendant by the summary judgment, the questions that went to the jury trying the claims against the other defendants were not reached with respect to Dr. Robbins. However, the jury in its special verdict found that there was probable cause to believe that Jensen was a danger to himself or others during the entire time that he was held at LCPH, but that there was not probable cause to believe that he was mentally ill for the entire time. The overall verdict was nonetheless rendered in favor of all defendants (except Dr. Robbins) after the jury had been properly instructed. Jensen now wants a jury to scrutinize Dr. Robbins' role in his detention.
 
 STANDARD OF REVIEW
 
 11
 This court reviews a summary judgment as a question of law (de novo). See Smith v. Hughes Aircraft Co. , 22 F.3d 1432, 1435 (9th Cir. 1993). Summary judgment may be affirmed on any ground supported in the record, including reasons not relied upon by the district court. See Oregon Short Line R.R. Co. v. Department of Revenue, 139 F.3d 1259, 1265 (9th Cir. 1998).
 
 STATE ACTION
 Section 1983 of Title 42 provides:
 
 12
 Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured . . . .
 
 
 13
 Jensen alleges that his involuntary commitment constitutes a violation of his rights under the Fourth and Fourteenth Amendments. Because S1983 and the Fourteenth Amendment are directed at the states, the statute supports a claim only when the alleged injury is caused by "state action" and not by a merely private actor, against whom tort remedies may be sought in state court. The Supreme Court has warned that "[c]areful adherence to the `state action' requirement preserves an area of individual freedom by limiting the reach of federal law and federal judicial power." Lugar v. Edmondson Oil Co., 457 U.S. 922, 936 (1982). The "color of law" requirement of S1983 is treated as the equivalent of the "state action" requirement under the Constitution. See RendellBaker v. Kohn, 457 U.S. 830, 838 (1982); West v. Atkins, 487 U.S. 42, 49 (1988).
 
 
 14
 Therefore, in order to prevail under S 1983, a plaintiff "must show (1) that Defendants deprived [him or] her of a right secured by the Constitution or laws of the United States and (2) that, in doing so, Defendants acted under color of state law." Doe v. Rosenberg, 996 F. Supp. 343, 348 (S.D.N.Y. 1998) (citing Flagg Bros., Inc. v. Brooks, 436 U.S. 149, 15657 (1978)), aff'd per curiam on same reasoning , 166 F.3d 507 (2d Cir. 1999); see also Fred Meyer, Inc. v. Casey, 67 F.3d 1412, 1413 (9th Cir. 1995). It is established that involuntary confinement or civil commitment is a significant deprivation of liberty that requires due process protections. See Addington v. Texas, 441 U.S. 418, 425 (1979).
 
 
 15
 The district court, as noted, did not believe that Dr. Robbins' conduct constituted "state action" and therefore excluded him as a defendant within the scope ofS1983. This court has not had occasion to rule on whether contract services provided by licensed private physicians to municipal governments in the detention and examination of persons brought into treatment facilities by police officers as possible mental patients constitutes state action within the meaning of S 1983. On the facts of this case, we hold that Dr. Robbins was a "state actor" for the purposes of being a defendant in a S1983 action.
 
 
 16
 Courts have developed various tests for determining whether an individual's actions are "state action." See Sutton v. Providence St. Joseph Med. Ctr., 192 F.3d 826, 835-36 & n.4 (9th Cir. 1999). The relevant one here is the "close nexus/ joint action" test.
 
 
 17
 When purely private actors obtain the help of a private physician to bring about the involuntary admission and detention of an allegedly mentally ill person for psychiatric examination, courts that have addressed this scenario in the S1983 context have held that there is no state action. See Doe, 996 F. Supp. at 349 (collecting cases). The courts analyzing the private resort to state power argument have rejected it. They point out that the license to practice medicine is also created by the state and, in a state-by-state analysis, have held that mental health commitments do not constitute a function "exclusively reserved to the State." Therefore, a person wrongly committed for evaluation is not necessarily the victim of state action. Because our case combines private actors and government officials, it does not fall within the rule of the cases concerningprivate actors who perform a "public function."
 
 
 18
 Blum v. Yaretsky, 457 U.S. 991, 1004 (1982), is instructive in this case, but not controlling. In that case, the Supreme Court found no state action where the nursing homes, which were heavily regulated, and licensed, and which received significant state funding, downgraded the care of patients. The Court focused on the nursing home's decision makers who followed professional medical standards and were not dictated to nor encouraged by the state. The Court found no state action when the determinations "ultimately turn on medical judgments made by private parties according to professional standards that are not established by the State. " Id. at 1008.
 
 
 19
 Dr. Robbins asserts that Blum is directly analogous. He argues that, by contract and in practice, it is the committing physician that must make the medical judgment under which a person is detained for a psychiatric evaluation. Indeed, the statutory obligation of the physician is to order the detention of those persons whom he or she believes to be a danger to self or others.[1] The service contract and LCPH's policies both anticipate that the psychiatrist on call will exercise clinical judgment. The real issue here is whether the state's involvement in the decision-making process rises to a level that overrides the "purely medical judgment" rationale of Blum.
 
 
 20
 In order to be considered state action, when a private actor participates in a governmental act, the court must find a sufficiently close nexus between the state and the private actor "so that the action of the latter may be fairly treated as that of the State itself." Jackson v. Metropolitan Edison Co., 419 U.S. 345, 350 (1974). The Court in Blum notes that detailed regulation of and substantial funding for private actors are not sufficient to transform the party's conduct into state action. 457 U.S. at 1011. The Court in Jackson clarified that the "State [must be] so far insinuated into a position of interdependence with the [private party] that it was a joint participant in the enterprise." 419 U.S. at 357-58.
 
 
 21
 The record is clear that Dr. Robbins and the County through its employees have undertaken a complex and deeply intertwined process of evaluating and detaining individuals who are believed to be mentally ill and a danger to themselves or others. County employees initiate the evaluation process, there is significant consultation with and among the various mental health professionals (including both PA psychiatrists and county crisis workers), and PA helps to develop and maintain the mental health policies of LCPH. We are convinced that the state has so deeply insinuated itself into this process that there is "a sufficiently close nexus between the State and the challenged action of the [defendant ] so that the action of the latter may be fairly treated as that of the State itself." Jackson, 419 U.S. at 350.
 
 
 22
 Although this case falls between lines drawn in other jurisdictions and presents an issue of first impression for this court, under the close nexus/joint action test, wehold that Dr. Robbins' conduct constituted state action.
 
 QUALIFIED IMMUNITY
 
 23
 The doctrine of "[q]ualified immunity strikes a balance between compensating those who have been injured by official conduct and protecting government's ability to perform its traditional functions." Wyatt v. Cole, 504 U.S. 158, 167 (1992) (citing Harlow v. Fitzgerald, 457 U.S. 800, 819 (1982)). Among the important rationales advanced for qualified immunity are the preservation of the government's ability to serve the public good by zealous enforcement of the law and the avoidance of deterring talented candidates from entering government employment for fear of liability. See id.
 
 
 24
 As a preliminary matter, a finding of "state action" on the part of Dr. Robbins does not require this court to find that he is entitled to qualified immunity. See Richardson v. McKnight, 521 U.S. 399 (1997); Wyatt 504 U.S. at 168.
 
 
 25
 There are two questions that must be answered with respect to Dr. Robbins' claim of qualified immunity. First, we must determine whether qualified immunity is categorically available. This requires an evaluation of the appropriateness of qualified immunity given its historical availability and the policy considerations underpinning the doctrine. See Richardson, 521 U.S. at 399. Second, if qualified immunity is available generally, we must determine whether Dr. Robbins is entitled to it in this case. This more particularized analysis would turn on whether Dr. Robbins violated a clearly established constitutional or statutory right of which a reasonable person would have known. See Harlow, 457 U.S. at 818.
 
 
 26
 We first address the categorical availability of qualified immunity. The Supreme Court in Richardson analyzed the availability of qualified immunity by looking to history and policy. Although S 1983 " `creates a species of tort liability that on its face admits of no immunities,' " Wyatt, 504 U.S. at 163 (quoting Imbler v. Pachtman, 424 U.S. 409, 417 (1976)), the Court nonetheless accords qualified immunity where a "tradition of immunity was so firmly rooted in the common law and was supported by such strong policy reasons that `Congress would have specifically so provided had it wished to abolish the doctrine.' " Id. at 164 (quoting Owen v. City of Independence, 445 U.S. 622, 637 (1980) (quoting Pierson v. Ray, 386 U.S. 547, 555 (1967))).
 
 
 27
 In Richardson, the Court held that qualified immunity was not available to privately employed prison guards because the Court was unable to identify a "firmly rooted " tradition of such immunity. 521 U.S. at 404. Although governmentemployed prison guards had enjoyed qualified immunity growing out of their employment status, the Court cited extensive history of private institutions involved in providing prison services and cases allowing the imposition of liability on private jailors. The Court therefore concluded that no firmly rooted tradition of immunity existed. See id. at 404-07. The Court left open the question whether some private actors closely related to governmental function might have some kind of qualified immunity in contexts unrelated to prisons.
 
 
 28
 Limited information has been presented on the historical availability of immunity for doctors asked by the government to make a decision to commit persons suspected of mental illness[2]. Dr. Robbinsquotes the Supreme Court in Richardson for the proposition that "[a]pparently the law did provide a kind of immunity for certain private defendants, such as doctors or lawyers who performed services at the behest of the sovereign." Id. at 407 (citing Tower v. Glover, 467 U.S. 914, 921 (1984), and J. Bishop, Commentaries on Non-Contract Law SS 704, 710 (1889)). The extent or "kind" of immunity is not discussed in Richardson. Jensen contends in his reply brief that the Court was referring to the early English distinction between physicians and surgeons, "holding[the former] but not [the latter], liable criminally, but not civilly, for malpractice" -a distinction abolished in 1858. (Citing J. Bishop, S 708). Jensen argues that, with respect to the type of case presented here, this distinction is inapposite.[3]
 
 
 29
 Dr. Robbins argues that the State of Oregon has provided for immunity from criminal and civil liability when an individual acts pursuant to Oregon's involuntary commitment statute, so long as the person acts in good faith, on probable cause, and without malice. Or. Rev. Stat. S 426.280(5).[4]
 
 
 30
 This statute's current legislative history indicates that the statutory immunity at issue in this case first appeared as an amendment in the 1987 Session Laws. 1987 Or. Laws, vol. 2, ch. 903, S 31 (amending Or. Rev. Stat.S 426.280 to include immunity provisions of Or. Rev. Stat. S 426.280(5)); cf. 1985 Or. Laws, vol. 1, ch. 242, S 5, (amending Or. Rev. Stat. S 426.280 but including only immunity for state medical officers in the context of trial visits). The legislative history is very sparse. We have found no committee reports or legislative comments directly pertaining to this provision. We have been unable to uncover even a suggestion that Oregon has a "firmly rooted tradition" of immunity, which Congress would have abolished explicitly had it intended to do so. The parties have provided us no information on the historical foundations of the statute, nor anything to convince us that a 1987 Oregon statute, without more, can provide the "firmly rooted tradition" that the Supreme Court requires. Moreover, the parties have not offered, and we have not found, any definitive common law history of immunity outside of Oregon that would support a finding of qualified immunity here.
 
 
 31
 The next step of the analysis requires us to examine the policy justifications for qualified immunity. The chief justifications for qualified immunity include: (1)"protecting the public from unwarranted timidity on the part of public officials" and " `encouraging the vigorous exercise of official authority.' " Richardson, 521 U.S. at 408 (quoting Butz v. Economou, 438 U.S. 478, 506 (1978)); (2) preventing lawsuits from distracting officials from their governmental duties, id. (citing Mitchell v. Forsyth, 472 U.S. 511, 526 (1985)); and (3) "ensur[ing] that talented candidates[are] not deterred by the threat of damages suits from entering public service," id. (citing Wyatt, 504 U.S. at 167).
 
 
 32
 The rationale of Richardson is instructive. In analyzing the policy justifications above, the Supreme Court was persuaded that, in the context of a private prison at least, unwarranted timidity was a problem that would be overcome by market forces as various firms vied to provide safe and efficient prison services. See id. at 408-11. The Court noted that insurance was available to limit exposure for violations of prisoners' rights and that employee indemnification agreements would limit the deterrence effect on qualified candidates. See id. at 410-11. Additionally, qualified candidates would be attracted as the firm responded to its needs for better employees by offering higher pay and extra benefits. See id. at 411. The Court also noted the flexibility of private firms to deal with overor under-zealous prison employees, a trait not available to the government due to civil-service restrictions. See id. at 410. Finally, the Court found that the distraction of litigation alone was insufficient to justify qualified immunity. See id. at 411-12.
 
 
 33
 This case is similar to Richardson in many respects. PA is a privately organized group of psychiatrists providing services to the government pursuant to contract. The privatization and market forces arguments are equally applicable here as well. PA psychiatrists must provide psychiatric services for the County with the market threat of replacement for failure to complete their duties adequately. As in Richardson, the potential for insurance, indemnification agreements, and higher pay all may operate to encourage qualified candidates to engage in this endeavor and to discharge their duties vigorously.
 
 
 34
 In Halvorsen v. Baird, 146 F.3d 680 (9th Cir. 1998), this court recently considered the issue of qualified immunity in the context of a private not-for-profit detoxification firm that was under contract to the state to provide involuntary detoxification services. In that case, we held that the private detoxification center that involuntarily admitted the plaintiff and held him overnight was not entitled to qualified immunity. See id. We noted that one main purpose of qualified immunity is to avert the "concern that threatened liability would, in Judge Hand's words, " `dampen the ardo[u]r of all but the most resolute, or the most irresponsible' " public officials." Id. at 685 (quoting Richardson, 521 U.S. at 408 (quoting Harlow v. Fitzgerald, 457 U.S. 800, 814 (1982) (quoting Gregoire v. Biddle, 177 F.2d 579, 581 (2d Cir. 1949)). We recognized that the private detoxification firm that contracted with the state, like the private prison firm in Richardson, " `face[s] threats of replacement by other firms with records that demonstrate their ability to do both a safer and a more effective job.' " Id. at 686 (quoting Richardson, 521 U.S. at 409). We also noted that, due to market forces,"if a detox center does a bad job, more effective competitors can bid on the municipal contracts." Id.
 
 
 35
 In the instant case, concerns about timidity are moderated by the likelihood that PA's failure to adequately complete the commitment and psychiatric care duties for which it has contracted will lead to its replacement by competitors. Likewise, the threat of liability can be overcome by private firms subject to market forces through such devices as monetary incentives, insurance, and indemnity agreements. If the state finds that the threat of liability is deterring talented private doctors or doctor groups from contracting with it, the state can raise compensation levels and provide other incentives to maintain high levels of quality participation in this joint undertaking. These are exactly the market forces contemplated in Richardson and Halvorsen.
 
 
 36
 Dr. Robbins has not presented evidence that these market forces are inapplicable or inadequate here, but instead attempts to distinguish Richardson on the ground that, unlike the prison management firm,PA was not systematically organized to carry on a major lengthy administrative task. Cf. Halvorsen, 146 F.3d at 686 (denying qualified immunity by relying on Richardson's "systematically organized" and "lengthy administrative task" rationale). PA, he argues, has contracted only to provide psychiatric services and help establish a sound clinical program. He asserts that it is SHGH that has contracted with the County to "operate and manage" LCPH. Rather than distinguishing this court's Halvorsen opinion, Dr. Robbins' attempts to analogize this case to the out-of-circuit district court case of Bartell v. Lohiser, 12 F. Supp. 2d 640 (E.D. Mich. 1998) aff'd, 215 F.3d 550 (6th Cir. 2000).
 
 
 37
 The Lohiser case held that a private foster care contractor and private social workers who contracted with the state to provide a recommendation about whether a mother was fit to parent were entitled to qualified immunity. See id. The court held that the defendants were private persons performing a discrete public service task at the express direction and under close supervision of governmental officials. See id. at 646. In Lohiser, the defendants had contracted to provide services with respect to discrete individuals. Id. at 643. Additionally, the private defendants in Lohiser were subject to active supervision and close monitoring, did not conduct any policymaking or administrative functions, and operated as a not-forprofit entity. Id. at 643, 646. By contrast, PA conducts a number and variety of tasks over the term of a three-year contract. Particularly, PA is responsible for accepting referrals, making admission and discharge decisions, providing on-going psychiatric care, and participating in at least some hospital policy-making. Although no one of these responsibilities is necessary or sufficient to our determination, together they show that PA is engaged in a complex administrative task. Furthermore, there is no indication that the services provided by PA could be described credibly as "a discrete public service task."
 
 
 38
 This leads to the "distraction " argument. In Richardson, the Supreme Court specifically noted that the threat of legal action creating a distraction for private individuals in a private firm is not an independently compelling factor. 521 U.S. at 411. The Richardson Court was influenced by the fact that qualified immunity never provides complete protection from the distractions of litigation, and also by the fact that, in Richardson, Tennessee had failed to provide immunity. Here, Oregon has not provided immunity to private doctors engaged in the difficult task of evaluating the allegedly mentally ill patient who poses a potential danger. Oregon has, however, provided an affirmative defense to both criminal and civil liability for those individuals who are authorized to make involuntary commitment and admission decisions when those decisions are made in "good faith, on probable cause and without malice." Or. Rev. Stat. S 426.280(5). The Supreme Court has specifically noted, however, that the existence of an historically available affirmative defense is insufficient to entitle a private party to qualified immunity. See Wyatt, 504 U.S., at 165. By its nature an affirmative defense provides some, but not absolute, protection against the distraction of litigations. Although Oregon has limited the potential for distractions caused by lawsuits, without other compelling justifications, the threat of distraction is insufficient to find that qualified immunity is available to Dr. Robbins. See Richardson, 521 U.S. at 411.
 
 
 39
 We need not determine, and decline to speculate, whether Jensen is entitled to a trial in this case. We note, however, that S 1983 plaintiffs must allege and show a material issue of fact as to the existence of a constitutional violation. The magistrate judge found that "Dr. Robbins' determination that probable cause existed to sign the certificate was reasonable under the circumstances and he did not violate clearly established law." This at leastsuggests that Jensen simply failed to show that Dr. Robbins had violated any constitutional right. Because the parties did not address these issues directly in their motions and responses regarding summary judgment in the trial court, the record may not be complete on these issues and we therefore decline to decide the appropriateness of summary judgment based on reasons not relied upon by the district court. See Oregon Short Line R.R. Co., 139 F.3d at 1265 (allowing summary judgment on any basis supported in the record). The summary judgment is reversed because it is not supported by either of the reasons given by the magistrate judge and presented to this court on appeal. Dr. Robbins' conduct constituted "state action," and he is not entitled to qualified immunity. We express no opinion on the availability of summary judgment on grounds not presented to the trial court.[5]
 
 
 40
 REVERSED AND REMANDED.
 
 
 41
 Neither party to recover costs on this appeal.
 
 
 
 Notes:
 
 
 [1]
 Or. Rev. Stat. S 426.232 provides in relevant part:
 (1) When a physician licensed to practice medicine by the Board of Medical Examiners for the State of Oregon believes a person who is brought to a hospital or nonhospital facility by a peace officer under ORS 426.288 or a person who is at a hospital or nonhospital is dangerous to self or to any other person and is in need of emergency care or treatment for mental illness, the physician may do one of the following:
 (a) After consulting with a physician or a qualified mental health professional . . . detain the person and cause the person to be admitted or, if the person is already admitted, cause the person to be retained in a hospital where the physician has admitting privileges or is on staff.
 
 
 [2]
 The paucity of federal case law may be accounted for by disputes arising out of mental health commitments being brought in state courts prior to the enactment of S1983.
 
 
 [3]
 There is some authority indicating that physicians who signed off on emergency commitment orders were given absolute immunity. See e.g., Dunbar v. Greenlaw, 128 A.2d 218, 221, 224 (Me. 1956) ("The law, no doubt, deems it prudent to provide against the possibility of a too apprehensive physician depriving a person mentally ill of any speedy care, treatment or protection indicated or failing to protect the public from a serious menace."); Mezullo v. Maletz, 118 N.E.2d 356, 357-58 (Mass. 1954). But such immunity was based on the physicians' status as witnesses, not as doctors. The emergency commitment proceedings were considered to be judicial proceedings, and the certifying physicians were held to be entitled to a witness' absolute immunity.
 
 
 [4]
 Or. Rev. Stat. S 426.280(5) provides in part:
 No physician, hospital or judge shall be held criminally or civilly liable for actions pursuant to . . . ORS 426.232, 426.234 . . . if the physician, hospital or judge acts in good faith, on probable cause and without malice.
 
 
 [5]
 We do not foreclose the possibility that Dr. Robbins may be able to assert an affirmative good faith defense. See Richardson, 521 U.S. at 413; Wyatt v. Cole, 504 U.S. 158, 169 (1992).