Lynn **TEWKSBURY**, Plaintiff,

v.

Frank **DOWLING**, M.D., and Thomas Aronson, M.D., Defendants.[1]

**No. 97 CV 5130(JM).**

United States District Court, E.D. New York.

Sept. 17, 2001.

---

1. Tewksbury dismissed her claims against Horacio Preval, M.D., Emilio Domingo, M.D., St. John's Episcopal Hospital, and Michael Maffetone pursuant to stipulations filed with the Court in January of this year. Therefore, it is ORDERED that the caption is amended as set forth above.

Jacob D. Fuchsberg Law Center, Mental Disability Law Clinic, Touro College, Huntington, By William M. Brooks, for Plaintiff.

Ivone, Devine & Jensen, Lake Success, By Brian E. Lee, for Defendant Dowling.

Callan, Koster, Brady & Brennan, New York, By Vincent Nagler, for Defendant Aronson.

*Memorandum of Decision and Order*

MISHLER, District Judge.

Lynn Tewksbury has sued Frank Dowling, M.D. and Thomas Aronson, M .D. alleging that her involuntary confinement at St. John's Episcopal Hospital ("St. John's") violated her right to due process under the Fourteenth Amendment. Tewksbury also contends that Defendants' conduct during her confinement constituted medical malpractice, false imprisonment, and assault and battery. Defendants have moved for summary judgment pursuant to Rule 56 of the Federal Rules

of Civil Procedure. Plaintiff cross-moves for partial summary judgment, seeking an order striking Defendants' affirmative defense of qualified immunity.[2]

The court may grant summary judgment if there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R.Civ.P. 56(c); *Wilkinson v. Russell*, 182 F.3d 89, 96–7 (2d Cir.1999), *cert. denied*, 528 U.S. 1155, 120 S.Ct. 1160, 145 L.Ed.2d 1072 (2000). The role of the court on a motion for summary judgment is "not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried, while resolving ambiguities and drawing reasonable inferences against the moving party." *Knight v. United States Fire Ins. Co.*, 804 F.2d 9, 11 (2d Cir.1986), *cert. denied*, 480 U.S. 932, 107 S.Ct. 1570, 94 L.Ed.2d 762 (1987). The Court must examine the facts in the light most favorable to the party opposing summary judgment, according the non-movant every inference that may be drawn from the facts presented. *Brown v. C. Volante Corp.*, 194 F.3d 351, 354 (2nd Cir.1999), *cert. denied*, 529 U.S. 1004, 120 S.Ct. 1268, 146 L.Ed.2d 218 (2000). Conclusory allegations, conjecture, and speculation, however, are insufficient to create a genuine issue of fact. *D'Amico v. City of N.Y.*, 132 F.3d 145, 149 (2d Cir.), *cert. denied*, 524 U.S. 911, 118 S.Ct. 2075, 141 L.Ed.2d 151 (1998).

Except where noted, the following facts are taken from the undisputed portions of Defendants' Rule 56.1 statements: [3]

On September 9, 1996, while working as a volunteer at Ruth C. Kinney Elementary School, Tewksbury entered the school office and began yelling and screaming, using profanities. Upon observing the school principal, Mr. Lavoie, Tewksbury proceeded out of the school to the sidewalk. Mr. Lavoie followed her out of the school and talked her out of getting into her car. Tewksbury then collapsed into Mr. Lavoie's arms and he brought her to the nurse's office. During the time she was in the nurse's office, Tewksbury was curled up in a ball and was unresponsive, irrational, incoherent, disheveled, disoriented, acting violently, and not in touch with reality. In addition, while at the nurse's office, Tewksbury mumbled that she had "killed Chris." Chris is the name of her husband.[4] Believing that her symptoms were caused by mental illness, the school called an ambulance and Tewksbury was voluntarily taken to the University Medical Center at the State University of New York at Stony Brook ("Stony Brook").

When she arrived at Stony Brook, Dr. Preval, a psychiatrist, signed commitment certification papers indicating that he believed that Tewksbury suffered from mental illness and was a danger both to herself and others. An employee of Stony Brook then contacted Defendant Dowling, a private physician affiliated with St. John's, who agreed to accept Tewksbury as a patient at St. John's. Tewksbury was then transported by ambulance to St. John's where she was admitted involuntarily pursuant to New York Mental Hygiene Law § 9.37. Dr. Dowling's admission orders included a medication order authorizing hospital staff to administer a psychotropic

---

**2.** After the Court had scheduled oral argument on Plaintiff's request, the parties stipulated to having the motions decided on submission.

**3.** Contrary to Defendant Dowling's assertion, Plaintiff did comply with Local Rule 56.1(b).

*See* Plaintiff's Counter–Statement Pursuant to Local Rule 56.1 at pp. 12–17.

**4.** Tewksbury contends that she was referring to a computer file that she had accidently deleted from her computer.

drug, Ativan, if needed. That evening, the nursing staff administered the Ativan. Tewksbury alleges that this was done forcibly following her refusal to voluntarily take the medication. The following morning, on September 10, 1996, Defendant Dowling first examined Tewksbury. Defendant Dowling asserts that he performed a psychiatric examination and obtained history from Tewksbury and her husband. He contends that Tewksbury was manifesting symptoms of manic behavior and he diagnosed her with a bipolar disorder, manic severe.. Tewksbury, on the other hand, alleges that Defendant Dowling did not attempt to gather any medical history from herself or her husband and that he merely admonished her to take her medication. Defendant Dowling prescribed several psychotropic drugs and Tewksbury alleges that when she refused to take them, he threatened to take her to court. As a result of the threats, Tewksbury accepted 300 milligrams of Lithium. On September 17, 1996, Defendant Dowling doubled Plaintiff's prescription dosage of Lithium, which according to Plaintiff was without her consent or knowledge and therefore constituted a "substantial departure from accepted judgment, practice or standards" and medical malpractice. On the same day, Defendant Dowling also prescribed Prolixin and Tewksbury alleges that he told her that she would remain confined until she took the drug.

Defendant Aronson, also a private physician affiliated with St. John's, provided the 72 hour certification pursuant to New York Mental Hygiene Law § 9.37. On September 12, 1996, Defendant Aronson authorized Tewksbury's continued confinement. Tewksbury contends that this was done without any independent psychiatric evaluation. Defendant Aronson asserts that he did examine her, although for only five minutes. (Aronson Depo. at 43). Defendant Aronson authorized Tewksbury's release from the hospital on September 19.

Plaintiff alleges that she has no prior history of mental illness, but for many years has suffered from Lyme disease. She says she is subject to flares, which include symptoms such as fatigue, pain and exhaustion, depression and short-term memory loss. However, according to Tewksbury, she never manifested behavior indicating that she posed a threat to anyone or herself prior to her detention in Stony Brook.

Tewksbury alleges that by authorizing her involuntary hospitalization when she did not pose a danger to herself or others as a result of mental illness, Defendants Dowling and Aronson violated both her procedural and substantive rights to due process under the fourteenth amendment to the United States Constitution (First and Second Causes of Action). Tewksbury also alleges that Defendant Dowling violated the fourteenth amendment and the New York Constitution by impermissibly coercing her into taking medication, and that he committed assault and battery as well as violated her due process rights under both the United States and New York Constitutions by forcibly administering the psychotropic drug Ativan, even though she did not pose a danger to herself or others (Causes of Action 6, 7, 8, 14, & 15). Tewksbury alleges that Defendant Dowling committed medical malpractice by failing to inform her of the side-effects of the medications he administered and by failing to inform her when he doubled her dosage of lithium (Causes of Action 9, 10, 19, & 20). Finally, Tewksbury contends that Defendants falsely imprisoned her (Causes of Action 11 & 12).

Defendants Dowling and Aronson move for summary judgment alleging that they are not state actors pursuant to 42 U.S.C. § 1983. Defendant Aronson further

moves to dismiss Plaintiff's state law claim for false imprisonment arguing that his actions were privileged. Defendant Dowling additionally moves for summary judgment on Plaintiff's state law claims contending that they are barred by Res Judicata. Plaintiff cross-moves for summary judgment contending that Defendants are not entitled to the defense of qualified immunity.

### 1. Did the Defendants act under color of state law?

 Section 1983 "imposes liability on anyone who, under color of state law, deprives a person 'of any rights, privileges, or immunities secured by the Constitution and laws.'" *K&A Radiologic Tech. Servs., Inc. v. Commissioner of Dep't of Health,* 189 F.3d 273, 280 (2d Cir.1999) (quoting *Blessing v. Freestone,* 520 U.S. 329, 340, 117 S.Ct. 1353, 137 L.Ed.2d 569 (1997)). Thus, in order to prevail, Plaintiff must establish two elements. First, Plaintiff must prove that Defendants deprived her of a right secured by the Constitution or laws of the United States. Tewksbury alleges that Defendants violated her right to due process under the Fourteenth Amendment by authorizing her involuntary hospitalization when she did not pose a danger to herself or others. The Supreme Court has recognized that "civil commitment for any purpose constitutes a significant deprivation of liberty that requires due process protection." *Addington v. Texas,* 441 U.S. 418, 425, 99 S.Ct. 1804, 60 L.Ed.2d 323 (1979). Thus, Tewksbury has established the first element.

 Tewksbury must also establish that Defendants acted under color of state law. The "under color of state law" requirement is legally indistinguishable from the "state action" requirement under the Constitution. *American Mfrs. Mut. Ins.*

*Co. v. Sullivan,* 526 U.S. 40, 49–50 & n. 8, 119 S.Ct. 977, 143 L.Ed.2d 130 (1999). The Supreme Court has developed a number of tests to determine whether a private party's conduct constitutes state action. The Court has held that private activity is state action (1) when it results from the State's exercise of "coercive power," or when the State provides "significant encouragement, either overt or covert," (2) when a private actor operates as a "willful participant in joint activity with the State or its agents," (3) when the private entity is controlled by an "agency of the State," (4) when it has been delegated a public function by the State, and (5) when it is "entwined with governmental policies" or when government is "entwined in [its] management or control." *Brentwood Academy v. Tennessee Secondary School Athletic Association,* 531 U.S. 288, 121 S.Ct. 924, 930, 148 L.Ed.2d 807 (2001) (citations omitted). These tests have been named the "state compulsion" test, the "close nexus/joint action" test, and the "public function" test. *Lugar v. Edmondson Oil Co.,* 457 U.S. 922, 939, 102 S.Ct. 2744, 73 L.Ed.2d 482 (1982).

Defendants contend that their action cannot be considered state action under any of these tests. Defendants rely on *Okunieff v. Rosenberg,* 166 F.3d 507 (2d Cir.1999) (per curiam) to support their argument that the involuntary commitment of Tewksbury under the New York State Mental Hygiene Law does not constitute state action. In *Okunieff,* the Second Circuit affirmed the District Court's determination that private physicians do not act under color of state law when they commit individuals pursuant to the Mental Hygiene Law. The District Court analyzed the private physicians' conduct under each of the state action tests and concluded that the private doctors were not state actors.

Tewksbury, however, contends that this case is distinguishable because unlike the private physicians in *Okunieff*, here Defendants jointly participated with State agents. Tewksbury argues that because Defendants jointly participated with state officials in her involuntary hospitalization, they engaged in state action. See *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 152, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970) (private individuals act under color of state law if they are "willful participants in joint activity with the State or its agents").

Defendants contend that *Okunieff* is controlling because there is no material factual difference between the facts in that case and the facts here. Defendants argue that Plaintiff's arguments regarding the close-nexus/joint action test were rejected by the Second Circuit in *Okunieff*. Defendants are correct that the court held that the fact that a private hospital has a contract with the Office of Mental Health that enables the private hospital to operate a psychiatric wing and is licensed by the State Mental Health Commission is insufficient to establish state action. *Okunieff*, 996 F.Supp. at 352; *see also Blum v. Yaretsky*, 457 U.S. 991, 102 S.Ct. 2777, 73 L.Ed.2d 534 (1982) (detailed regulation of and substantial funding for private actors are not sufficient to transform the party's conduct into state action). However, here Tewksbury alleges more—she alleges that joint action between government officials, employees of Stony Brook, and Defendants.

Defendants counter that the fact that state actors were involved is still insufficient to meet the joint action test for state action. They contend that Dr. Preval made no recommendation to them regarding her confinement and that they conducted their own independent examination. The Supreme Court has held that decision makers at private nursing homes were not state actors because their determinations "ultimately turn[ed] on medical judgments made by private parties according to professional standards that are not established by the State." *Id.* at 1008, 102 S.Ct. 2777. Therefore, if the decision to commit Tewksbury was based purely on their own independent medical judgment, Defendants would be correct that they are not state actors. However, Tewksbury was admitted to St. John's without any independent examination. Defendant Dowling admits in his affidavit that he accepted Tewksbury as a patient over the phone. He further testifies that his first meeting with Tewksbury was not until the following morning. Therefore, Defendants are incorrect that the initial decision to commit Tewksbury was a result of their independent medical judgment.

Tewksbury cites several cases to support her argument that because Defendants acted jointly with state officials when they committed her, they acted under color of state law. In *Jensen v. Lane County*, 222 F.3d 570 (9th Cir.2000), the Ninth Circuit held that a private psychiatrist who provided contract services to a municipal government was a state actor. The court explained:

> The record is clear that Dr. Robbins and the County through its employees have undertaken a complex and deeply intertwined process of evaluating and detaining individuals who are believed to be mentally ill and a danger to themselves or others. County employees initiate the evaluation process, there is significant consultation with and among the various mental health professionals (including both PA psychiatrists and county crisis workers), and PA helps to develop and maintain the mental health policies of LCPH. We are convinced that the state has so deeply insinuated itself into this process that there is "a suffi-

ciently close nexus between the State and the challenged action of the [defendant] so that the action of the latter may be fairly treated as that of the State itself."

*Id.* at 575 (quoting *Jackson v. Metropolitan Edison Co.,* 419 U.S. 345, 350, 95 S.Ct. 449, 42 L.Ed.2d 477 (1974)).

■ Likewise, in this case, although Defendants are private physicians employed by a private hospital, they jointly participated with state officials. Here, Dr. Preval, undisputably a state actor, concluded that Tewksbury required hospitalization. A Stony Brook employee then telephoned Defendant Dowling who accepted Tewksbury for hospitalization at St. John's Hospital. Tewksbury was then transferred to St. John's and admitted without any further examination. Defendant Dowling did not meet Tewksbury until the following day. Defendant Aronson did not meet with Tewksbury until two days later, when he authorized her continued confinement. Further, Defendant Dowling admits in his deposition that when he did perform his psychiatric evaluation on the following day,[5] he relied on information he obtained from a social worker at Stony Brook. Therefore, like *Jensen,* county employees initiated the evaluation process and there was consultation among the County health professionals and the private psychiatrists. *See also, Coleman v. Town of Hempstead,* 30 F.Supp.2d 356 (E.D.N.Y.1999) (Spatt, J.)(finding that complaint alleged sufficient facts to establish state action where complaint alleged that private corporation performed drug testing on behalf of town).

The fact that Defendants acted under color of state law is further underscored by the fact that they could not have com-

mitted Tewksbury without the assistance of Dr. Preval, who is unquestionably a state actor. Tewksbury was committed pursuant to § 9.37 of the Mental Hygiene Law ("MHL"). Under this section of the MHL, the Director of Community Services must first certify that the patient requires immediate hospitalization. Only upon the application of the Director of Community Services, could Defendants, as private physicians working for a private hospital, hospitalize Tewksbury pursuant to this section of the MHL. Judge Amon, in an unpublished case, held that this was joint action sufficient to establish state action. In *Kudla v. Queens Hospital Center,* 94 CV 4426 (E.D.N.Y. Mar. 31, 1998), the plaintiff was involuntarily committed pursuant to § 9.27 of the MHL. Judge Amon determined that § 9.27 of the MHL, required action by four different individuals and that in the case before her, two of the individuals were unquestionably state actors. The private physician defendant "could not have involuntarily admitted plaintiff to [Mount Sinai Hospital] absent those certifications." *Id.* at 67. Similarly, here Defendants could not have involuntarily hospitalized Tewksbury without the certification from Dr. Preval.

Under these authorities, the Court finds that Defendants acted under the color of state law when they involuntarily hospitalized Tewksbury.

**B. Are Plaintiff's claims barred by Collateral Estoppel?**

■ Defendant Dowling moves for summary judgment on the civil rights violations as well as the state law claims of false imprisonment and medical malpractice arguing that the affirmative defense of res judicata bars these claims.[6] Although

---

**5.** Tewksbury alleges that at this meeting, Defendant Dowling merely told her to take her

medication and did not perform any independent examination.

**6.** Defendant Dowling concedes that he did not

Defendant Dowling speaks in terms of res judicata, the doctrine at issue here is collateral estoppel. *See e.g., Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 326 n. 5, 99 S.Ct. 645, 58 L.Ed.2d 552 (1979) ("Under the doctrine of res judicata, a judgment on the merits in a prior suit bars a second suit involving the same parties or their privies based on the same cause of action. Under the doctrine of collateral estoppel, on the other hand, the second action is upon a different cause of action and the judgment in the prior suit precludes relitigation of issues actually litigated and necessary to the outcome of the first action.")

Tewksbury filed a lawsuit against the State of New York in the New York Court of Claims challenging the actions of the state officials at Stony Brook. On June 2, 1999, the Court of Claims (Silverman, J.) granted the defendant's motion for summary judgment dismissing the claims against the State of New York. The Court of Claims first recognized that commitment pursuant to the MHL is privileged in the absence of medical malpractice. The court then held that the evidence established that "the defendant did not deviate from accepted medical practice and that claimant has failed to prove a prima facie case [of medical malpractice]." [7]

■ Under the doctrine of collateral estoppel, "once a court has decided an issue of fact or law necessary to its judgment, that decision may preclude relitigation of the issue in a [subsequent] suit on a different cause of action involving a party to the first action." *Allen v. McCurry*, 449 U.S. 90, 94, 101 S.Ct. 411, 66 L.Ed.2d 308 (1980). Collateral estoppel is applied in a later court if: (1) there has been a final determination on the merits of the issue sought to be precluded; (2) the party against whom issue preclusion is sought had a full and fair opportunity to contest the decision invoked as dispositive in the later controversy; and (3) the issue sought to be precluded by the earlier suit is the same issue involved in the later action. *Davis v. Halpern*, 813 F.2d 37, 39 (2d Cir.1987).

■ The doctrine of collateral estoppel does not apply to this case because the issue involved in the Court of Claims was not the same issue that is involved here. The Court of Claims opinion involved only the actions of Dr. Preval and the Stony Brook employees, not the actions of Defendant Dowling or Defendant Aronson. Further, Tewksbury alleges that her condition had changed by the time she reached St. John's. Her husband likewise testified that her condition had changed. He testified that although Tewksbury babbled somewhat while at Stony Brook, at St. John's she spoke coherently. (Depo. at 88–89).

Because the issues involved in this case differ substantially from the issues decided by the Court of Claims, Tewksbury's claims are not barred by collateral estoppel. *See, e.g., Neaderland v. Commissioner*, 424 F.2d 639, 642 (2d Cir.1970) (doctrine is confined to "situations where the matter raised in the second suit is identical in all respects with that decided in the first proceeding.")

raise the defense of res judicata in his answer, but explains that the Court of Claims decision did not become final until after he had filed his answer in this action. He does not, however, move to amend his answer. This Court may construe Defendant's motion as one to amend his answer and entertain the defense regardless. *Block v. First Blood Assocs.*, 988 F.2d 344, 350 (2d Cir.1993).

7. The Court of Claims decision was affirmed by the Appellate Division. *Tewksbury v. State*, 273 A.D.2d 376, 710 N.Y.S.2d 909 (2d Dep't 2000).

### C. Is there a material issue of fact regarding whether Defendants committed malpractice?

■ Defendant Aronson moves for summary judgment on Tewksbury's claim of false imprisonment. To satisfy the state law elements of false imprisonment, Tewksbury must show that: (1) Defendants intended to confine Plaintiff; (2) Plaintiff was conscious of the confinement; (3) Plaintiff did not consent to the confinement; and (4) that the confinement was not otherwise privileged. *Parvi v. Kingston*, 41 N.Y.2d 553, 556, 394 N.Y.S.2d 161, 362 N.E.2d 960 (1977). In the instant motion, Defendants only dispute whether Plaintiff has raised any issue of fact regarding the fourth element (i.e., privilege).

If Defendants complied with the involuntary commitment provisions of the Mental Health Law, their actions are privileged, and the false imprisonment claim cannot be maintained. In the absence of an allegation that Defendants failed to comply with the provisions of the MHL, Tewksbury must establish that Defendants engaged in medical malpractice. *Ferretti v. Town of Greenburgh*, 191 A.D.2d 608, 610, 595 N.Y.S.2d 494, 497 (2d Dep't 1993).

■ Tewksbury contends that Defendants engaged in medical malpractice because their conduct substantially departed from accepted judgment, practices and standards. Tewksbury submits the affidavit of an expert, Dr. Peter Stastny, who is currently a Senior Psychiatrist with the New York State Office of Mental Health, to establish a material issue of fact regarding whether Defendants' conduct constituted medical malpractice. Dr. Stastny testifies that it is his opinion based upon a reasonable degree of medical certainty that at the time of Plaintiff's confinement at St. John's, Tewksbury did not have a mental condition that posed a substantial risk of physical harm to herself or others. He further testifies that in concluding that Tewksbury was dangerous, Defendants reached decisions that substantially departed from accepted clinical standards. Dr. Stastny reached these opinions after reviewing the deposition testimony and affidavits of Defendants, Tewksbury, and Tewksbury's husband, among others. This testimony is sufficient to establish a material issue of fact regarding whether Defendants committed malpractice. *Rodriguez v. City of New York*, 72 F.3d 1051, 1061 (2d Cir.1995) (reversing the District Court's grant of summary judgment because "the question of what the generally accepted standards [are] is a question of fact")

■ Defendant Aronson argues that this Court should dismiss Dr. Stastny's opinion as incredible. Defendant does **not** make any arguments regarding Dr. Stastny's qualifications or the admissibility of his testimony under Fed.R.Evid. 702 and 703. Rather, he merely argues that Dr. Stastny previously worked as an expert for Plaintiff's attorney in the *Okunieff* case and that his testimony in this case differs from the testimony he gave in *Okunieff.* It is clear, however, that any discrepancies and inconsistencies in Dr. Stastny's testimony are matters to be considered by the jury in assessing his credibility. *Allied Colloids Inc. v. American Cyanamid Co.*, 64 F.3d 1570, 1575 (Fed.Cir.1995) ("Credibility determinations, the weighing of evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether he is ruling on a motion for summary judgment or for a directed verdict") (quoting *Anderson v. Liberty Lobby*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)).

Moreover, as the Second Circuit has specifically stated

it [i]s beyond the province of the court on a motion for summary judgment to decide between the experts' competing testimony on the question of what were the generally accepted standards in the medical community as to the circumstances that warrant a physician's order of emergency involuntary commitment. *Rodriguez v. City of New York*, 72 F.3d 1051, 1061 (2d Cir.1995).

## D. Are Defendants protected by Qualified Immunity?

Tewksbury cross-moves for summary judgment seeking an order striking Defendants' affirmative defense of qualified immunity. Tewksbury argues that the defense of qualified immunity is not available to these private Defendants.

 In *Richardson v. McKnight*, 521 U.S. 399, 117 S.Ct. 2100, 138 L.Ed.2d 540 (1997), the Supreme Court held that prison guards employed by a private firm were not entitled to a qualified immunity from suit by prisoners alleging a Section 1983 violation. In deciding whether a private actor is entitled to assert qualified immunity under Section 1983, the Supreme Court held that a court must look first to whether "[h]istory ... reveal[s] [that] a 'firmly rooted tradition' of immunity [is] applicable" to the class of private actors involved in the case, and, second, to "[w]hether the immunity doctrine's purposes warrant immunity" for that type of private actor. *Id.* at 407, 117 S.Ct. 2100.

 This Court must therefore first determine whether the "parties seeking immunity were shielded from tort liability when Congress enacted the Civil Rights Act of 1871— § 1 of which is codified at 42 U.S.C. § 1983." *Wyatt v. Cole*, 504 U.S. 158, 164, 112 S.Ct. 1827, 1831, 118 L.Ed.2d 504 (1992). Defendants do not point to any authority to establish that there was a common law tradition of immunity from

liability for privately employed physicians who involuntarily commit their patients. Plaintiff, on the other hand, has cited several early cases finding no such immunity at common law. *See e.g., Beckham v. Cline*, 151 Fla. 481, 10 So.2d 419 (Fla. 1942). The only Circuit Court to address this issue found that there is no "firmly rooted tradition" of immunity applicable to privately employed physicians who commit individuals suspected of mental illness. *Jensen v. Lane County*, 222 F.3d 570 (9th Cir.2000).

Next, the Court must determine whether the immunity doctrine's purposes warrant immunity for private physicians. This question is the more pertinent of the two since the Supreme Court has stated that "irrespective of the common law support, we will not recognize an immunity available at common law if § 1983's history or purpose counsel against applying it in § 1983 actions." *Wyatt*, 112 S.Ct. at 1831. The Supreme Court describes the purposes of the immunity doctrine as: (1) protecting against unwarranted timidity on the part of government officials, (2) ensuring that talented candidates are not deterred from entering public service, and (3) preventing the distraction of governmental officials by lawsuits. *Richardson v. McKnight*, 521 U.S. 399, 408, 117 S.Ct. 2100, 2105, 138 L.Ed.2d 540 (1997). In *Wyatt*, the Supreme Court refused to extend qualified immunity to private parties in the case before it because

> unlike school board members, or police officers, or Presidential aides, private parties hold no office requiring them to exercise discretion, nor are they principally concerned with enhancing the public good.... Moreover, unlike with government officials performing discretionary functions, the public interest will not be unduly impaired· if private individuals are required to proceed to

trial to resolve their legal disputes. In short, the nexus between private parties and the historic purpose of qualified immunity is simply too attenuated to justify such an extension of our doctrine of qualified immunity.

*Wyatt,* 112 S.Ct. at 1833–34 (citations omitted). Likewise, in *Richardson,* the Court concluded that, because of the influence of market forces on private employers, these same considerations did not support the extension of qualified immunity to the privately employed prison guards. *Id.* at 408–12, 117 S.Ct. at 2106–07.

Tewksbury submits the affidavit of Rodney Drake, a registered nurse who has worked in psychiatric emergency rooms in private hospitals for eight years to establish that financial considerations play a major role in any decision of whether or not to admit a patient. He testifies that none of the three private hospitals at which he worked would admit patients if they did not have a method of payment[8].

Even without this testimony, it is clear that Defendants are subject to competitive market pressures and have a financial incentive to commit patients. Therefore, "marketplace pressures provide [Defendants] with strong incentives to avoid overly timid, insufficiently vigorous, unduly fearful, or 'non-arduous' employee job performance." *Richardson,* 117 S.Ct. at 2107. Accordingly, like the privately employed prison guards in *Richardson,* the purposes behind the qualified immunity defense do not support its application here.

There are three Circuit Court cases that have examined whether private physicians are entitled to a qualified immunity from suit. In *Sherman v. Four County Coun-*

*seling Center,* 987 F.2d 397 (7th Cir.1993), the Seventh Circuit found that a private psychiatric facility that was ordered by a state court to detain the plaintiff against his will and to treat him as it deemed appropriate was entitled to qualified immunity. *Id.* at 405–06. The court, however, rested its holding largely on the fact that the defendant had acted pursuant to court order on an emergency basis. *Id.* The Ninth Circuit, on the other hand, found that qualified immunity was unavailable to a private physician who, pursuant to a contract with a municipal government, detained an individual suspected of mental illness. *Jensen v. Lane County,* 222 F.3d 570 (9th Cir.2000). Finally, the Eleventh Circuit held that a jail's medical director who was an employee of a private, for-profit company that had contracted with the county to provide medical services to the jail was not entitled to a qualified immunity from suit. *Hinson v. Edmond,* 192 F.3d 1342 (11th Cir.1999). This Court finds that *Sherman v. Four County Counseling Center* is distinguishable since Defendants were not acting pursuant to a court order and the remaining authority supports a finding that Defendants are not entitled to a defense of qualified immunity.

Defendant Dowling makes no arguments regarding the applicability of qualified immunity to private defendants. Defendant Aronson makes two arguments. First, he argues that if this Court finds that he is a state actor, he must be entitled to qualified immunity. As he states, "[o]bviously, plaintiff cannot have it both ways." However, a finding that Defendants acted under color of state law, does not require this Court to find that he is entitled to qualified

---

**8.** Defendants object to the admissibility of this testimony. Defendant Dowling contends that this testimony has nothing to do with the Defendants who are private physicians, not hospitals. Defendant Aronson argues that

Mr. Drake's testimony has nothing to do with the hospitals involved in this case. Further, Defendants do not see any relevance to this testimony.

immunity. *Richardson v. McKnight,* 521 U.S. 399, 117 S.Ct. 2100, 138 L.Ed.2d 540 (1997). Second, Defendant Aronson argues that the case *Ferretti v. Town of Greenburgh,* 191 A.D.2d 608, 595 N.Y.S.2d 494, 497–98 (2d Dept.1993) establishes that Defendants are entitled to a qualified immunity from suit. This case, however, does not discuss qualified immunity. The Appellate Division only states that a Section 1983 cause of action has "almost identical" elements as a cause of action for false imprisonment and one of the elements of false imprisonment is that the confinement was not otherwise privileged. *Id.* at 610, 595 N.Y.S.2d 494. Defendant Aronson clearly confuses privilege with immunity from suit.

This Court concludes that Defendants, as private physicians, are not entitled to the defense of qualified immunity.

For the foregoing reasons, Plaintiff's cross-motion for summary judgment is GRANTED. Defendants' motions for summary judgment are DENIED.

SO ORDERED.