**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| KENNETH RAWSON, an individual, *Plaintiff-Appellant*, <br><br> v. <br><br> RECOVERY INNOVATIONS, INC., a corporation; SAMI FRENCH, an individual; JENNIFER CLINGENPEEL, an individual; VASANT HALARNAKAR, M.D., an individual, *Defendants-Appellees.* | No. 19-35520 <br><br> D.C. No. 3:17-cv-05342-BHS <br><br><br> OPINION |

Appeal from the United States District Court
for the Western District of Washington
Benjamin H. Settle, District Judge, Presiding

Argued and Submitted July 8, 2020
Seattle, Washington

Filed September 9, 2020

Before: RICHARD R. CLIFTON, D. MICHAEL
FISHER,[*] AND MILAN D. SMITH, JR., Circuit Judges.

Opinion by Judge Milan D. Smith, Jr.

---

[*] The Honorable D. Michael Fisher, United States Circuit Judge for the U.S. Court of Appeals for the Third Circuit, sitting by designation.

## SUMMARY[**]

### Civil Rights

The panel reversed the district court's summary judgment in favor of defendants and remanded in an action brought pursuant to 42 U.S.C. § 1983 alleging that defendants, a private nonprofit corporation and three of its current and former employees, violated plaintiff's Fourth and Fourteenth Amendment rights by wrongfully detaining him, forcibly injecting him with antipsychotic medications, and misleading a court into extending his period of involuntary commitment for a total of 55 days.

The district court dismissed plaintiff's claims against defendants based on the conclusion that defendants were not acting under color of state law. The panel held that, although defendants were nominally private actors, exercised professional medical judgment, and were not statutorily required to petition for additional commitment, on balance, the facts weighed toward a conclusion that they were nevertheless state actors. The panel held that given the necessity of state imprimatur to continue detention, the affirmative statutory command to render involuntary treatment, the reliance on the State's police and *parens patriae* powers, the applicable constitutional duties, the extensive involvement of the county prosecutor, and the leasing of defendants' premises from the state hospital, "a sufficiently close nexus between the state and the private actor" existed here "so that the action of the latter may be

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

fairly treated as that of the State itself." *Jensen v. Lane Cty.*, 222 F.3d 570, 575 (9th Cir. 2000). The panel therefore concluded that defendants were acting under color of state law with respect to the actions for which plaintiff attempted to hold them liable.

## COUNSEL

Timothy K. Ford (argued) and Jesse Wing, MacDonald Hoague & Bayless, Seattle, Washington; Sam Kramer, Madia Law LLC, Minneapolis, Minnesota; for Plaintiff-Appellant.

Benjamin R. Justus (argued) and Lory R. Lybeck, Lybeck Pedreira & Justus PLLC, Mercer Island, Washington, for Defendants-Appellees.

## OPINION

M. SMITH, Circuit Judge:

Kenneth Rawson appeals the district court's dismissal of his 42 U.S.C. § 1983 claims against Recovery Innovations, Inc. (RII) and its current and former employees Dr. Vasant Halarnakar, Advanced Registered Nurse Practitioner Jennifer Clingenpeel, and Mental Health Professional Sami French (collectively, Defendants). Rawson alleges that Defendants violated his Fourth and Fourteenth Amendment rights by wrongfully detaining him, forcibly injecting him with antipsychotic medications, and misleading a court into extending his period of involuntary commitment for a total of 55 days. On summary judgment, the district court dismissed Rawson's claims because it concluded that

Defendants did not act under color of state law.    We conclude to the contrary, and therefore reverse.

## Facts and Prior Proceedings

On March 4, 2015, Rawson allegedly made comments about automatic weapons and mass murder to a bank teller in Clark County, Washington.  When Rawson re-entered the same bank the next day, the bank employees called the sheriffs.    Upon their arrival, the sheriffs immediately detained Rawson, who did not physically resist but yelled that he had a gun and that his rights were being violated. Rawson had a valid concealed carry permit and was a veteran; the sheriffs confiscated and unloaded Rawson's handgun without incident.  After Rawson allegedly made statements to the sheriffs about "how people are against him," the sheriffs took Rawson into protective custody, placed him on a mental hold, and transported him by ambulance to a general hospital.   The sheriffs' actions triggered a series of events generally governed by Washington's Involuntary Treatment Act (ITA), Wash. Rev. Code (RCW) Ch. 71.05.  *See* RCW § 71.05.153(2)–(3).[1]

At the hospital, a Clark County Designated Mental Health Professional (DMHP) evaluated Rawson and filed a petition in state court for a 72-hour involuntary commitment. *See* RCW §§ 71.05.153(4), .020(11).  The DMHP arranged for Rawson to be taken to RII's Lakewood facility in neighboring Pierce County.[2]   RII is a private nonprofit

---

[1] Unless otherwise noted, citations herein to RCW Ch. 71.05 are to the 2014 edition in effect at the time of Rawson's commitment.

[2] The following year, the Washington Court of Appeals concluded that Rawson's detention had been improper because the DMHP did not

corporation. It leases its Lakewood evaluation and treatment facility from the State of Washington on the grounds of one of the State's main psychiatric hospitals, Western State Hospital. RII's Medical Director at Lakewood, Dr. Halarnakar, is a full-time physician at Western State Hospital.

Once at RII, Rawson was evaluated by Clingenpeel and French, who prescribed medication and completed a petition for an additional 14 days of intensive treatment, certifying that Rawson was both "gravely disabled" and "presents a likelihood of serious harm to others." *See* RCW §§ 71.05.170, .210, .230. They based these conclusions on their evaluations of Rawson and information in the police report. The petition also stated that Rawson "den[ied] [having] any problem other than the bank and police misunderstanding." The court held a probable cause hearing and granted the 14-day petition on March 10.

During the 14-day commitment, Dr. Halarnakar met with Rawson. Dr. Halarnakar's notes indicate that Rawson was calm, cooperative, and polite, but had pressured speech. Though Rawson reported no symptoms of schizophrenia, Dr. Halarnakar wrote that Rawson needed to keep taking his medication. In his second evaluation of Rawson, Dr. Halarnakar documented only that Rawson was argumentative and denied having a mental illness, denied needing antipsychotic medications, and denied having suicidal or homicidal ideations. Dr. Halarnakar nevertheless concluded that Rawson was paranoid, had no insight, and needed further treatment.

---

consult with an examining physician before initiating commitment. *In re Det. of K.R.*, 381 P.3d 158, 159 (Wash. Ct. App. 2016).

Dr. Halarnakar and French then petitioned for an additional 90-day commitment, alleging that Rawson had "threatened, attempted, or inflicted physical harm" upon a person or property "during the period in custody." *See* RCW §§ 71.05.230(8), .290.  They recommended that the court involuntarily commit Rawson to Western State Hospital.  In response to a later request for the specific statements that were threatening, French conceded Rawson had made no "threatening statements."

Rawson exercised his right to request a jury trial, which was continued multiple times while he remained involuntarily committed at RII.  *See* RCW § 71.05.300.  In preparation for the trial, Dr. Halarnakar and French communicated extensively with the Pierce County Deputy Prosecuting Attorney regarding discharge possibilities, current treatment methods, the strength of the evidence against Rawson, and the theory to argue to the jury. *See* RCW § 71.05.130.  Meanwhile, a court-appointed expert psychiatrist evaluated Rawson and concluded that he was not dangerous, his frustrations were not unreasonable, and he had no symptoms related to psychosis or a mood disorder.

On April 29, almost two months after Rawson's arrival, RII finally released Rawson pursuant to an attorney-negotiated agreement.  Rawson later brought this § 1983 action against RII and many of the individuals involved in his commitment.

On summary judgment, the district court dismissed Rawson's claims against Defendants based on the conclusion that they were not acting under color of state law. The court found that the "public function" test was not satisfied because Rawson did not establish "that involuntary commitments are both traditionally and exclusively governmental."  The court found that the "joint action" /

"close nexus" test was not satisfied because Rawson did not establish "government involvement sufficient to override the purely medical judgment of the private individual."

Rawson timely appealed.

## Jurisdiction and Standard of Review

We have jurisdiction pursuant to 28 U.S.C. § 1291. We review a grant of summary judgment *de novo*, construing the evidence in the light most favorable to the non-moving party. *Anderson v. Warner*, 451 F.3d 1063, 1067 (9th Cir. 2006) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)). "[W]e must determine whether there are any genuine issues of material fact and whether the district court correctly applied the relevant substantive law." *Id.*

## Analysis

## I.

Pursuant to § 1983, a defendant may be liable for violating a plaintiff's constitutional rights only if the defendant committed the alleged deprivation while acting under color of state law. *See Jensen v. Lane Cty.*, 222 F.3d 570, 574 (9th Cir. 2000). Similarly, a violation of the plaintiff's constitutional rights cognizable under the Fourteenth Amendment can occur only by way of state action. *Id.* Thus, the color of law and state action inquiries are the same. *Id.*

Before we can answer the question of whether Defendants acted under color of law, we must identify the "specific conduct of which the plaintiff complains." *Caviness v. Horizon Cmty. Learning Ctr., Inc.*, 590 F.3d 806, 812 (9th Cir. 2010) (quoting *Am. Mfrs. Mut. Ins. Co. v.*

*Sullivan*, 526 U.S. 40, 51 (1999)).  Here, Rawson seeks to hold Defendants liable for certain actions relating to the 14-day and 90-day petitions, as well as his detention and forcible medication pursuant to the authority provided by those petitions.  The specific alleged conduct Rawson challenges includes involuntarily committing him without legal justification, knowingly providing false information to the court, and forcibly injecting him with antipsychotic medications without his consent.[3]  The relevant inquiry is therefore whether Defendants' role as custodians, as litigants, or as medical professionals constituted state action. *See id.*

## II.

The determination of whether a nominally private person or corporation acts under color of state law "is a matter of normative judgment, and the criteria lack rigid simplicity." *Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 295–96 (2001).  "[N]o one fact can function as a necessary condition across the board for finding state action; nor is any set of circumstances absolutely sufficient, for there may be some countervailing reason against attributing activity to the government." *Id.*

We have recognized at least four different general tests that may aid us in identifying state action: "(1) public function; (2) joint action; (3) governmental compulsion or coercion; and (4) governmental nexus." *Kirtley v. Rainey*, 326 F.3d 1088, 1092 (9th Cir. 2003) (citation omitted).

---

[3] Rawson does not seek to hold Defendants liable for their actions relating to his initial 72-hour commitment for evaluation.  Thus, neither Defendants' acceptance of Rawson from the County DMHP, their detention of Rawson for the initial 72 hours, nor their treatment of Rawson during that time, are at issue.

"Satisfaction of any one test is sufficient to find state action, so long as no countervailing factor exists." *Id.* "Whether these different tests are actually different in operation or simply different ways of characterizing the necessarily fact-bound inquiry that confronts the Court in such a situation need not be resolved here." *Lugar v. Edmondson Oil Co., Inc.*, 457 U.S. 922, 939 (1982).

"The public function test is satisfied only on a showing that the function at issue is 'both traditionally and exclusively governmental.'" *Kirtley*, 326 F.3d at 1093 (quoting *Lee v. Katz*, 276 F.3d 550, 555 (9th Cir. 2002)). The close nexus and joint action tests may be satisfied where the court finds "a sufficiently close nexus between the state and the private actor 'so that the action of the latter may be fairly treated as that of the State itself,'" or where the State has "so far insinuated into a position of interdependence with the [private party] that it was a joint participant in the enterprise." *Jensen*, 222 F.3d at 575–58 (quoting *Jackson v. Metro. Edison Co.*, 419 U.S. 345, 350, 357–58 (1974)). Governmental compulsion or coercion may exist where the State "has exercised coercive power or has provided such significant encouragement, either overt or covert, that the choice must in law be deemed to be that of the State." *Blum v. Yaretsky*, 457 U.S. 991, 1004 (1982).

At bottom, the inquiry is always whether the defendant has "exercised power 'possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law.'" *West v. Atkins*, 487 U.S. 42, 49 (1988) (quoting *United States v. Classic*, 313 U.S. 299, 326 (1941)).

## III.

Before we proceed with our full analysis, it is appropriate to explain why we do not apply the color of law test as articulated by the district court. The district court analyzed the issue before us under a species of the close nexus/joint action test purportedly applicable specifically to medical professionals. Derived from language in *Jensen*, 222 F.3d at 575, the district court's test asked whether state actors overrode the independent professional medical judgment of the Defendants. The district court analyzed the communications between Defendants and the County prosecutor and concluded that none of the prosecutor's statements were the cause of any decisions made by Defendants relating to treatment or detention. Accordingly, the district court concluded that the prosecutor did not override the Defendants' medical judgment, and that Defendants therefore did not act under color of state law.

## A.

The origins of the district court's analysis lie in the Supreme Court's decision in *Blum v. Yaretsky*, 457 U.S. 991 (1982). In *Blum*, the Supreme Court held that state Medicaid administrators were not liable under § 1983 for decisions made by privately owned and operated nursing homes to discharge Medicaid patients without notice or hearing. *Id.* at 993, 1003. The Court noted that the case before it was "obviously different" from cases where (as in our case) the defendant is the nominally private party, but found that such cases nevertheless "shed light upon the analysis necessary to resolve the present case." *Id.* at 1003–04. The Court interpreted such cases as "assur[ing] that constitutional standards are invoked only when it can be said that the State is *responsible* for the specific conduct of which the plaintiff complains." *Id.* at 1004.

The Court concluded that the state Medicaid administrators were not "responsible" for the nursing homes' discharge decisions. *Id.* at 1005.**[4]** While the state administrators responded to the discharges by adjusting Medicaid benefits, the discharge decisions themselves were made by the physicians and nursing home administrators alone. *Id.* There was "no suggestion that those decisions were influenced in any degree by the State's obligation to adjust benefits." *Id.* The Court rejected the argument that the State's requirement that nursing homes fill out placement forms should change its analysis. *Id.* at 1008. The relevant regulations did "not require the nursing homes to rely on the forms" in making discharge decisions. *Id.* Rather, the discharge decisions "ultimately turn[ed] on medical judgments made by private parties according to professional standards that are not established by the State." *Id.* The Court noted that if it had been the case that the state "affirmatively commands" the summary discharge or transfer of Medicaid patients who are thought to be inappropriately placed in the nursing facilities, "we would have a different question before us." *Id.* at 1005.

A few years later, the Court clarified the reach of *Blum*'s professional judgment analysis in *West v. Atkins*, 487 U.S. 42 (1988). *West* involved a private contract physician rendering treatment services for inmates at a state prison, whom the Court ultimately concluded was acting under color of state law. *Id.* at 43, 57. Reviewing a Fourth Circuit decision that had concluded that the physician did not act under color of state law because he applied his independent

---

**[4]** The Court held that state subsidization of a private facility is insufficient to convert that facility's actions into state action, even though in this case Medicaid was paying the expenses of more than 90% of the patients. *Id.* at 1011.

professional medical judgment, the Court clarified that "'the exercise of . . . independent professional judgment,' is not, as the Court of Appeals suggested, 'the primary test.'" *Id.* at 52 n.10 (alteration, internal quotation marks, and citation omitted); *see also id.* at 52 ("Defendants are not removed from the purview of § 1983 simply because they are professionals acting in accordance with professional discretion and judgment."). Instead, the Court looked to factors such as the State's constitutional duty to provide adequate medical care to those it has incarcerated, *id.* at 54, the physician's reliance on state authority to treat the plaintiff, *id.* at 55, the necessity of the physician cooperating with prison management, *id.* at 51, and the inability of the incarcerated plaintiff to access other medical care of his own choosing, *id.* at 55. The Court concluded that neither *Blum*, nor the then-recent decision in *Rendell-Baker v. Kohn*,[5] dictated that a physician who otherwise should be found to be acting under color of state law "does not act under color of state law merely because he renders medical care in accordance with professional obligations." *Id.* at 52 n.10.

We previously considered the application of *Blum* in the context of involuntary civil commitment in *Jensen v. Lane County*, 222 F.3d 570 (9th Cir. 2000). *Jensen* concerned a private contract psychiatrist in Oregon who participated in the initial emergency detention of the plaintiff for mental health evaluation, and whom we ultimately concluded was acting under color of state law under the close nexus/joint action test. *Id.* at 575–76. The plaintiff's detention had been initiated by police and was first reviewed by a county mental health specialist, who forwarded the case to the defendant

---

[5] 457 U.S. 830 (1982). In *Rendell-Baker*, the Court concluded that the discharge decisions of a privately owned and operated school for maladjusted high school students were not state action. *Id.* at 842.

contract psychiatrist (Dr. Robbins) and a second county mental health specialist. *Id.* at 572–73. Without personally examining the plaintiff, Dr. Robbins signed an order authorizing up to five days of detention for evaluation. *Id.* at 573. The plaintiff would be held at the county psychiatric hospital, for which Dr. Robbins' private practice group helped develop the mental health policies. *Id.* at 573, 575. Based on his subsequent personal examinations, Dr. Robbins would have released the plaintiff by day three. *Id.* at 573. However, the plaintiff was held the maximum five days until the second county mental health specialist completed his investigation and concluded that there was insufficient evidence upon which to pursue further detention. *Id.*

We found *Blum* to be "instructive in this case, but not controlling." *Id.* at 575. We acknowledged that in Dr. Robbins' circumstances, "by contract and in practice," the committing physician must exercise "medical judgment." *Id.* However, we concluded that "[t]he real issue here is whether the state's involvement in the decision-making process rises to a level that overrides the 'purely medical judgment' rationale of *Blum*." *Id.* We concluded that "[t]he record is clear that Dr. Robbins and the County through its employees have undertaken a complex and deeply intertwined process of evaluating and detaining individuals who are believed to be mentally ill and a danger to themselves or others." *Id.* We thus concluded that "the state has so deeply insinuated itself into this process" that "Dr. Robbins' conduct constituted state action" under the close nexus/joint action test. *Id.* at 575–76. The fact that Dr. Robbins may have applied his independent medical judgment to any particular decision did not insulate him from a finding of state action.

**B.**

The district court here applied a specific interpretation of our *Jensen* opinion articulated by another district court in *Hood v. King Cty.*, No. C15-828RSL, 2017 WL 979024 (W.D. Wash. Mar. 14, 2017), *aff'd sub nom. Hood v. Cty. of King*, 743 F. App'x 79 (9th Cir. 2018). As here, *Hood* involved nominally private institutions involved in the involuntary commitment process pursuant to Washington's ITA.**[6]** The district court in *Hood* interpreted *Jensen* as premised on the conclusion that "the state's involvement in the decision-making process *overrode the private provider's 'purely medical judgment.'*" *Id.* at *12 (emphasis added). The court concluded that "[t]he facts here reveal sustained and routine cooperation between King County and the hospitals, but they do not show that the county's involvement overrode the hospital staff's medical judgment such that the hospitals' actions can fairly be treated as those of the government." *Id.* at *13.**[7]**

---

**[6]** However, *Hood* concerned actions taken during an initial 72-hour commitment for emergency evaluation, which distinguishes it from the case before us. *See* 2017 WL 979024, at *3.

**[7]** We affirmed *Hood* in an unpublished memorandum disposition, but we did not expressly endorse the district court's "overrode the . . . medical judgment" test. 2017 WL 979024 at *12; *see* 743 F. App'x at 81. We agreed with the district court that the private hospital's employees had "evaluated Hood and developed a course of action based on their 'medical judgments' and 'according to professional standards,'" *id.* (quoting *Blum*, 457 U.S. at 1008), but we also relied more generally on *Jensen*'s language that the defendant and the county had engaged in a "complex and deeply intertwined process of evaluating and detaining individuals," *id.* (quoting *Jensen*, 222 F.3d at 575), which we found lacking in *Hood*.

The parties dispute whether *Hood*'s test is a fair interpretation of *Jensen* or *Blum*. We observe first that neither *Jensen* nor *Blum* suggested that the exercise of independent medical judgment is dispositive of the color of state law inquiry. Both cases undertook a close, fact-intensive analysis in which the exercise of professional judgment was only one factor. This approach was consistent with Supreme Court precedents telling us that the color of state law "criteria lack rigid simplicity," and "no one fact can function as a necessary condition across the board." *Brentwood Acad.*, 531 U.S. at 295–96. Moreover, *West* held that "'the exercise of . . . independent professional judgment,' is not . . . 'the primary test.'" 487 U.S. at 52 n.10 (alteration and citation omitted).

Additionally, we did not actually ask in *Jensen* whether state actors "overrode" the defendant's "purely medical judgment." Our exact language was: "The real issue here is whether the state's involvement in the decision-making process rises to a level that overrides the 'purely medical judgment' *rationale of Blum*." *Jensen*, 222 F.3d at 575 (emphasis added). Essentially, our question was whether the state's involvement in the conduct at issue provided sufficient reason to find state action, notwithstanding the "countervailing reason" of some purely medical judgment. *Brentwood Acad.*, 531 U.S. at 295–96.

A finding that individual state actors or other state requirements literally "overrode" a nominally private defendant's independent judgment might very well provide relevant information. But it is a mistake to focus too narrowly on this question.

# IV.

With the foregoing clarification, we consider the full factual context of this case, paying particular attention to the facts that played a material role in previous decisions. We conclude that the facts in this case show that the Defendants acted under color of state law.[8]

## A.

The Supreme Court has recognized that private parties may act under color of state law when they exercise powers traditionally held by the state. As noted above, the Supreme Court in *West v. Atkins*, 487 U.S. 42 (1988) held that a private contract physician rendering treatment services for prisoners at a state prison acted under color of law. *Id.* at 57. Part of the Court's reasoning was that any deprivation effected by the private contract physician would be

---

[8] Rawson argues that Defendants acted under color of law under the "public function" test, contending that the relevant provisions of the Washington Code of 1881 and 1915 demonstrate that involuntary commitment was an exclusively governmental function in Washington prior to the passage of the ITA in 1973. "While many functions have been traditionally performed by governments, very few have been 'exclusively reserved to the State.'" *Flagg Bros.*, 436 U.S. at 158 (quoting *Jackson*, 419 U.S. at 352). We have not previously addressed whether nominally private medical professionals involved in longer term, court-ordered involuntary commitment perform a public function, either in general terms or specifically in the State of Washington. *See Jensen*, 222 F.3d at 574–75 (discussing courts' application of the public function test to the initial phase of committing someone for no more than a few days for emergency evaluation) (citing *Doe v. Rosenberg,* 996 F. Supp. 343, 349 (S.D.N.Y. 1998) (collecting cases)). However, given that the historical evidence was not directly evaluated by the district court, and that the remainder of our analysis is sufficient to support a judgment in Rawson's favor, we decline to resolve the historical exclusivity question.

necessarily "caused, in the sense relevant for state-action inquiry, by the State's exercise of its right to punish [the plaintiff] by incarceration and to deny him a venue independent of the State to obtain needed medical care." *Id.* at 55.

As in *West*, any deprivation effected by Defendants here was in some sense caused by the State's exercise of its right, pursuant to both its police powers and *parens patriae* powers, to deprive Rawson of his liberty for an extended period of involuntary civil commitment. *See* RCW § 71.05.010 (2020) ("The provisions of this chapter . . . are intended by the legislature . . . [t]o protect the health and safety of persons suffering from behavioral health disorders and to protect public safety through use of the parens patriae and police powers of the state."); *Addington v. Texas*, 441 U.S. 418, 426 (1979) ("The state has a legitimate interest under its *parens patriae* powers in providing care to its citizens who are unable because of emotional disorders to care for themselves; the state also has authority under its police power to protect the community from the dangerous tendencies of some who are mentally ill.").[9]

In that sense, Defendants were "clothed with the authority of state law" when they detained and forcibly treated Rawson beyond the initial 72-hour emergency evaluation period. *West*, 487 U.S. at 49 (quoting *Classic*, 313 U.S. at 326). Thus, under *West*, if Defendants "misused [their] power by demonstrating deliberate indifference to"

---

[9] *See also Beltran-Serrano v. City of Tacoma*, 442 P.3d 608, 614 n.9 (Wash. 2019) (referring to the "detention of a person suffering from mental illness" as a "law enforcement related activit[y]"); Developments in the Law, *Civil Commitment of the Mentally Ill*, 87 Harv. L. Rev. 1190, 1207–12, 1222–23 (1974) (describing the origins of the *parens patriae* and police powers relating to the mentally ill).

Rawson's rights to liberty, refusal of treatment, and/or due process, "the resultant deprivation was caused, in the sense relevant for state-action inquiry, by the State's exercise of its right to" civilly commit Rawson for purposes of protecting both the public and Rawson himself. *Id.* at 55.**[10]** These facts, in light of *West*, weigh in favor of finding that Defendants acted under color of state law.

## B.

The Supreme Court has also held that private parties may act under color of state law when they perform actions under which the state owes constitutional obligations to those affected. The Court reasoned in *West* that the State has an Eighth Amendment obligation "to provide adequate medical care to those whom it has incarcerated," and that the State

---

**[10]** *West* did not articulate which of the four color of law "tests," if any, its reasoning pertained to. *Cf. Lugar*, 457 U.S. at 939 (observing that it remains unclear "[w]hether these different tests are actually different"). In a now-vacated opinion, we previously assumed that *West* was decided under the "public function" test. *Pollard v. The GEO Grp., Inc.*, 629 F.3d 843, 856 (9th Cir. 2010), *rev'd sub nom. Minneci v. Pollard*, 565 U.S. 118 (2012). However, that test as traditionally formulated requires close scrutiny of historical exclusivity, *see Flagg Bros. v. Brooks*, 436 U.S. 149, 158 (1978), and *West* did not analyze historical exclusivity at all. Indeed, the Court later observed that private contractors "were heavily involved in prison management during the 19th century." *Richardson v. McKnight*, 521 U.S. 399, 405 (1997). *But see Pollard*, 629 F.3d at 857 (reasoning that the power of incarceration was exclusively governmental even if prison management was not). For purposes of this opinion, we find it unnecessary to peg *West* to one of our four recognized tests. Whether understood as undertaking a "public function" analysis, or a more open-ended "close nexus" inquiry with the greater the role of state authority (and/or state duties, as discussed in the subsequent subsection), the greater the nexus with the State, subject to countervailing considerations, *see Brentwood Acad.*, 531 U.S. at 295–96, *West* unquestionably supports a finding of state action here.

employs private contract physicians, and relies on their professional judgment, to fulfill this obligation. *Id.* at 54–55.[11]

Similarly here, the State has a Fourteenth Amendment obligation toward those whom it has ordered involuntarily committed. *See Addington*, 441 U.S. at 425 ("This Court repeatedly has recognized that civil commitment for any purpose constitutes a significant deprivation of liberty that requires due process protection."). In the now-vacated *Pollard* opinion, where we held that employees of a privately-operated prison acted under color of state law, we rejected the notion that "by adding an additional layer, the government can contract away its constitutional duties" by having private actors rather than state actors perform some of the work. *See Pollard*, 629 F.3d at 856 (quoting *Holly v. Scott*, 434 F.3d 287, 299 n.1 (4th Cir. 2006) (Motz, J., concurring in the judgment)). Accordingly, the State's particular Fourteenth Amendment duties toward persons involuntarily committed weighs toward a finding of state action in this case.

---

[11] Both *Blum* and *Jackson* also recognized the relevance of state duties regarding the care or service at issue. In *Blum*, the Court noted that although the relevant state constitutional provisions "authorize[d] the legislature to provide funds for the care of the needy," the state constitution did not "mandate the provision of any particular care, much less long-term nursing care." 457 U.S. at 1011. In *Jackson*, the Court noted that while the state had imposed a duty on regulated utilities to furnish service, the state itself had no duty to furnish service. 419 U.S. at 353. In both cases, the Court made these observations in the context of rejecting a "public function" theory of state action. In accordance with the preceding footnote, we find the Court's concern with state duties relevant to the "close nexus" inquiry as well.

## C.

We have recognized that private parties may act under color of state law when the state significantly involves itself in the private parties' actions and decisionmaking at issue. In *Jensen*, the defendant private physician was part of a team of mental health professionals that included individuals acting in their capacity as county employees.  222 F.3d at 575.  That team was jointly responsible for making the medical determinations relevant to the duration of the plaintiff's emergency detention.  *Id.*  We concluded that the defendant and the county employees were together involved in a "complex and deeply intertwined process" that satisfied *Jackson*'s standard for whether the State has "so far insinuated into a position of interdependence with the [private party] that it was a joint participant in the enterprise."  *Id.* (quoting *Jackson*, 419 U.S. at 357–58); *see also id.* ("We are convinced that the state has so deeply insinuated itself into this process that there is 'a sufficiently close nexus between the State and the challenged action of the [defendant] so that the action of the latter may be fairly treated as that of the State itself.'" (quoting *Jackson*, 419 U.S. at 350)).

With respect to the conduct challenged here, Defendants did not work in coordination with mental health professionals acting in their capacity as county or state employees.[12]  However, mental health professionals were not the only relevant actors.  Here, the county prosecutor

---

[12] However, we note that RII's medical director at Lakewood, Dr. Halarnakar, was a full-time state employee at Western State Hospital.  The record before us does not reveal whether or the extent to which Western State Hospital, through Dr. Halarnakar, may therefore have been involved in the administration of RII's Lakewood facility.

played an outsized role in the duration of Rawson's detention, particularly during the pendency of Rawson's jury trial on the 90-day petition.

In preparation for the jury trial, Dr. Halarnakar and French communicated extensively with the prosecutor regarding discharge possibilities, current treatment methods, the strength of the evidence against Rawson, and the theory to argue to the jury. The evidence even suggests that the prosecutor altered Dr. Halarnakar's medical diagnosis— from "likelihood of serious harm" to "gravely disabled"— after exposing Defendants' lack of evidence for the former and proposing the latter. Regardless of whether the prosecutor "overrode" any particular decision Dr. Halarnakar otherwise would have made, the evidence at minimum shows that the prosecutor was heavily involved in the decisionmaking process regarding Rawson's detention, diagnosis, and treatment.

Defendants attempt to explain away their coordination with the prosecutor by arguing that the ITA gives them no choice. This argument is unavailing. The ITA's mandate that civil commitment petitions be argued only by the county prosecutor (or state attorney general), *see* RCW § 71.05.130, only strengthens the conclusion that the State is a joint participant in this enterprise. The ITA itself insinuates the State into the process of involuntary civil commitment at issue here, regardless of whether the treatment facility is nominally public or private. To conclude that Defendants act under color of state law within this process does not cast blame on them. It simply charges Defendants with meeting the constitutional standards applicable to those whose actions are "made possible only because [they are] clothed with the authority of state law." *West*, 487 U.S. at 49 (quoting *Classic*, 313 U.S. at 326).

Defendants also argue that the prosecutor's role here is analogous to the public defender in *Polk County v. Dodson*, 454 U.S. 312 (1981), and therefore that the prosecutor is not a state actor when prosecuting commitment petitions. We disagree. The prosecutor here is not advocating for the private interests of the hospital or mental health professionals. Neither the prosecutor's nor Defendants' "professional and ethical obligation[s] . . . set [them] in conflict with the State." *West*, 487 U.S. at 51. Instead, Defendants cooperate with the executive arm of the State to further the *State's* interest in protecting both the public and the patient. *See id.*

Accordingly, the role played by the county prosecutor here, in practice and by statute, supports a finding of state action by the Defendants.

## D.

The Supreme Court has also recognized that private parties may act under color of state law when the state authorized or approved the private parties' actions. In *Jackson v. Metropolitan Edison Company*, 419 U.S. 345 (1974), the Court held that a privately owned and operated utility, despite extensive state regulation and a state-protected monopoly, did not commit state action when it terminated electrical service to the plaintiff without notice or hearing. *Id.* at 346, 358–59. The Court explained that extensive state regulation is not enough to create state action, but rather that "the inquiry must be whether there is a sufficiently close nexus between the State and the challenged action of the regulated entity so that the action of the latter may be fairly treated as that of the State itself." *Id.* at 351, 358.

The Court devoted particular attention to rejecting the argument that the State had "specifically authorized and approved" the challenged termination practice. *Id.* at 354. The Court observed that while the utility was required to file its general tariff with the public utility commission, which included a provision reserving the right to terminate service for nonpayment, it was unclear whether the commission actually had the power to disapprove that provision. *Id.* at 355. In addition, the tariff became effective when the commission took no action to disapprove it, rather than after a hearing and commission approval. *Id.* at 355, 357. The Court distinguished *Public Utilities Commission v. Pollak*, 343 U.S. 451 (1952), where the public utilities commission had commenced its own investigation of a practice and given its imprimatur to the practice after a full hearing. *Jackson*, 419 U.S. at 356–57. In the case at hand, "there was no such imprimatur placed on the practice" by the State. *Id.* at 357.

Here, much of the challenged activity received clear state imprimatur. Medical providers in Washington can neither detain nor forcibly treat a mental health patient past an initial 72-hour emergency evaluation period without a court order. *See* RCW §§ 71.05.153, .210. In contrast to the public utilities commission in *Jackson*, the reviewing state court here unquestionably has the power to disapprove a petition for involuntary commitment and treatment. *See id.* § 71.05.237. In fact, the state court approved the 14-day petition in this case.

Accordingly, the role of state authorization and approval weighs in favor of a finding of state action in this case.

### E.

The Supreme Court has also reasoned that state action may lie in private conduct that is "affirmatively

commanded" by state protocols. In *Blum*, for example, the Supreme Court highlighted that if it had been the case that the State "affirmatively commands" nursing homes to summarily discharge or transfer Medicaid patients thought to be inappropriately placed there, "we would have a different question before us." 457 U.S. at 1005. Here, in multiple respects, we have that different question.

Defendants are charged with applying state protocols and criteria in making evaluation and commitment recommendations, and are "affirmatively command[ed]" by the state to render treatment without informed consent in many circumstances. *Id.*; *see* RCW §§ 71.05.210, .214.**[13]** These state requirements and protocols that command private action weigh in favor of finding that Defendants acted under color of state law in this case.

## F.

The Supreme Court has also found state action may exist when private parties operate on public property or in public facilities. In *Burton v. Wilmington Parking Authority*, 365 U.S. 715 (1961), the Supreme Court found that a privately owned and operated restaurant that leased its premises from a municipal parking authority committed

---

**[13]** RCW § 71.05.210 provides that a detained individual "shall receive such treatment and care as his or her condition requires," regardless of whether that individual consents to treatment, except in some circumstances regarding antipsychotic medications within 24 hours of a trial or hearing. RCW § 71.05.214 provides that "[t]he department shall develop statewide protocols to be utilized by professional persons and [DMHPs] in administration of this chapter . . . The protocols shall provide uniform development and application of criteria in evaluation and commitment recommendations, of persons who have, or are alleged to have, mental disorders and are subject to this chapter."

state action when it refused service to the plaintiff because he was a "Negro." *Id.* at 716–17. The Court noted that the parking authority provided the premises, the utilities, and the repair work to the restaurant, as well as tax-exempt status. *Id.* at 720. The Court also noted that the building was clearly marked as a public building. *Id.* In addition, the Court noted that the financial success of the restaurant, which was purportedly enhanced by segregation, was essential to the financing of the public parking structure. *Id.* at 723–24.

The Court concluded that, by its "inaction" of failing to require nondiscriminatory service as a term of the lease, the parking authority had "not only made itself a party to the refusal of service, but ha[d] elected to place its power, property and prestige behind the admitted discrimination." *Id.* at 725. The parking authority, "and through it the State," had "so far insinuated itself into a position of interdependence" with the restaurant that the restaurant's discrimination constituted state action under a "joint participant" theory. *Id.* Highlighting the factually bound nature of its decision, the Court limited its holding to cases where "a State leases public property in the manner and for the purpose shown to have been the case here." *Id.* at 726.

This case resembles *Burton* in that RII was leasing its Lakewood premises from the State on the grounds of Western State Hospital, which was not only clearly marked as a state hospital but was also historic and recognizable. *See Burton*, 365 U.S. at 726; *see also Jackson*, 419 U.S. at 358 (finding that a particularly salient aspect of *Burton* was that the nominally private defendant paid money to the State not just as a common taxpayer, but as a "lessee[] of public property"). Unlike in *Burton*, the record here does not indicate whether Western State Hospital is in any sense financially dependent upon the business of RII's Lakewood

facility. *See Burton*, 365 U.S. at 723–24. Presumably, however, the State receives some rent from its lessee. While it is unclear how closely the facts of a particular case must match *Burton* to find state action on that basis alone,[14] *Burton* remains instructive and there are enough similarities here to consider the leasing of state property as a factor weighing in favor of finding state action.

## Conclusion

Although Defendants were nominally private actors, exercised professional medical judgment, and were not statutorily required to petition for additional commitment,[15] on balance, the facts weigh toward a conclusion that they were nevertheless state actors.

As in *Jensen*, the State here has "undertaken a complex and deeply intertwined process [with private actors] of evaluating and detaining individuals" for long-term commitments, and therefore, "the state has so deeply insinuated itself into this process" that "[the private actors'] conduct constituted state action." *See Jensen*, 222 F.3d at 575. Just as *West* found state action with private contract

---

[14] Some courts have described the Supreme Court's later *American Manufacturers Mutual Insurance v. Sullivan* decision as casting doubt on *Burton*, noting that the Court referred to *Burton* as an "early" case that promulgated a "vague" standard. 526 U.S. 40, 57 (1999); *see, e.g.*, *Crissman v. Dover Downs Ent. Inc.*, 289 F.3d 231 (3d Cir. 2002) (en banc) (limiting the reach of *Burton* to cases that replicate *Burton*'s facts, rejecting broad "symbiotic relationship" test). However, *Burton* remains good law, and is relevant here because RII is in fact a "lessee[] of public property." *Jackson*, 419 U.S. at 358.

[15] *See Blum*, 457 U.S. at 1006 ("[T]he physicians, and not the forms, make the decision."). However, Defendants were required to apply state-promulgated criteria. *See* RCW § 71.05.214.

physicians rendering treatment services for prisoners at a state prison, we hold the same under the arrangement the State has devised for involving private actors in long-term involuntary commitments. Defendants were not merely subject to extensive regulation or subsidized by state funds. *See Blum*, 457 U.S. at 1011; *Jackson*, 419 U.S. at 358.

Given the necessity of state imprimatur to continue detention, the affirmative statutory command to render involuntary treatment, the reliance on the State's police and *parens patriae* powers, the applicable constitutional duties, the extensive involvement of the county prosecutor, and the leasing of their premises from the state hospital, we conclude that "a sufficiently close nexus between the state and the private actor" existed here "so that the action of the latter may be fairly treated as that of the State itself." *See Jensen*, 222 F.3d at 575 (quoting *Jackson*, 419 U.S. at 350).

We therefore conclude that Defendants were acting under color of state law with respect to the actions for which Rawson attempts to hold them liable. We reverse the district court's grant of summary judgment to the contrary and remand for further proceedings.

**REVERSED and REMANDED.**