**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| PASADENA REPUBLICAN CLUB, a General Purpose Political Committee, on behalf of itself and its members,<br>*Plaintiff-Appellant*,<br><br>v.<br><br>WESTERN JUSTICE CENTER, a California nonprofit corporation; CITY OF PASADENA; JUDITH CHIRLIN, *Defendants-Appellees.* | No. 20-55093<br><br>D.C. No. 2:18-cv-09933-AWT-AFM<br><br>OPINION |

Appeal from the United States District Court
for the Central District of California
A. Wallace Tashima, District Judge, Presiding[*]

Argued and Submitted December 7, 2020
Pasadena, California

Filed January 25, 2021

---

[*] A. Wallace Tashima, Circuit Judge, for the Ninth Circuit Court of Appeals, sitting in the United States District Court, for the Central District of California, by designation.

Before:  Susan P. Graber and Carlos T. Bea, Circuit Judges,
and Jennifer A. Dorsey,** District Judge.

Opinion by Judge Bea

---

**SUMMARY***

---

### Civil Rights

The panel affirmed the district court's dismissal of civil rights claims and summary judgment in favor of the City of Pasadena in an action brought by the Pasadena Republican Club against the City and its lessee, the Western Justice Center, and the Center's Executive Director, alleging First Amendment violations arising from the Center's rescission, on the basis of political and religious viewpoint, of an agreement to rent out a space for the Republican Club's speaking event.

Western Justice Center (WJC), a private nonprofit organization, has leased property from the City of Pasadena since 1994 and uses it primarily to provide legal services to Pasadena citizens.  It currently pays $1 per month in rent. The Pasadena Republican Club claimed that WJC's leasing arrangement with the City constituted sufficient grounds for the Club to bring its constitutional claims.

---

** The Honorable Jennifer A. Dorsey, United States District Judge for the District of Nevada, sitting by designation.

*** This summary constitutes no part of the opinion of the court.  It has been prepared by court staff for the convenience of the reader.

The panel noted that in *Burton v. Wilmington Parking Auth.*, 365 U.S. 715, 725 (1961), the Supreme Court held that, in certain circumstances, a private actor who leases government property must comply with the constitutional restraints as though they were binding covenants written into the lease agreement itself.  Although the Court in *Burton* deemed the lessee to be a state actor, it reserved this finding for the set of circumstances under which the "State has so far insinuated itself into a position of interdependence with a private actor that it must be recognized as a joint participant in the challenged activity."

The panel held that WJC was not a state actor for purposes of the Club's constitutional claims.  Neither the circumstances under which WJC rehabilitated the building and acquired the lease, nor the terms of the lease itself, converted WJC into a state actor.  To apply the ruling in *Burton*, the private party's conduct of which the plaintiff complains must be inextricably intertwined with that of the government.  Here, the panel noted that WJC and the City lack the significant degree of integration, dependency and coordination that was apparent in *Burton*.

The panel held that the Club failed to state a claim under § 1985(3) because WJC and its agents were not state actors and because the Club did not allege that the City or some other state actor participated in the alleged conspiracy to deprive the Club of its constitutional rights.  Finally, in affirming the district court's summary judgment in favor of the City, the panel held that the government did not, without more, become vicariously liable for the discretionary decisions of its lessee.  The undisputed facts indicated that the City had not delegated any final policy-making authority that caused the Club's alleged constitutional injury.

**COUNSEL**

Anthony T. Caso (argued), Center for Constitutional Jurisprudence, Fowler School of Law, Chapman University, Orange, California, for Plaintiff-Appellant.

William E. Thomson III (argued), Debra Wong Yang, Dhananjay S. Manthripragada, Daniel R. Adler, and Jason S. Kim, Gibson Dunn & Crutcher LLP, Los Angeles, California, for Defendants-Appellees Western Justice Center and Judith Chirlin.

Dawn Cushman (argued), Jonathan A. Ross, and Carol A. Humiston, Bradley & Gmelich LLP, Glendale, California, for Defendant-Appellee City of Pasadena.

Justin R. Sarno and Sylvia Chu, Dentons US LLP, Los Angeles, California, for Amicus Curiae League of California Cities.

**OPINION**

BEA, Circuit Judge

The restraints set forth in the United States Constitution generally bind only government actors, excluding private actors from its reach. Nearly sixty years ago, however, the Supreme Court held that, in certain circumstances, a private actor who leased government property must comply with the constitutional restraints as though they were binding covenants written into the lease agreement itself. Although the Court deemed the lessee to be a state actor, it reserved this finding for the set of circumstances under which the "State has so far insinuated itself into a position of

interdependence with [a private actor] that it must be recognized as a joint participant in the challenged activity." *Burton v. Wilmington Parking Auth.*, 365 U.S. 715, 725 (1961). Indeed, the Court explicitly limited its applicability to the "peculiar facts or circumstances present," cautioning that the conclusions drawn from the case "are by no means declared as universal truths on the basis of which every state leasing agreement is to be tested."[1] *Id.* at 725–26. We, now, must revisit this precedent and determine whether it is applicable to the case before us.

Pasadena Republican Club (the "Club") contracted with Western Justice Center ("WJC"), a private nonprofit organization, to rent some space in WJC's building for a speaking event. Shortly before the event, however, WJC learned about the speaker's association with a politically active group that, as WJC explained, holds "positions on same-sex marriage, gay adoption, and transgender rights [that] are antithetical to [its] values." WJC then rescinded the rental agreement. In response, the Club filed a lawsuit alleging that its First Amendment rights had been violated. The Club claimed that WJC's leasing arrangement with the City of Pasadena (the "City") constituted sufficient grounds to bring constitutional claims against WJC, a private § 501(c)(3) nonprofit organization dedicated to civic improvement. Relying exclusively on *Burton*, the Club filed

---

[1] In fact, the dissenting justices criticized the Court's opinion for failing to elucidate a workable standard in determining what constitutes "state action." *See Burton*, 365 U.S. at 728 (Harlan, J., dissenting) ("The Court's opinion, by a process of first undiscriminatingly throwing together various factual bits and pieces and then undermining the resulting structure by an equally vague disclaimer, seems to me to leave completely at sea just what it is in this record that satisfies the requirement of 'state action.'").

claims against the City, WJC, and WJC's Executive Director under 42 U.S.C. § 1983.

We reject the Club's assertions and hold that WJC is not a state actor for purposes of the Club's constitutional claims. Neither the circumstances under which WJC rehabilitated the building and acquired the lease, nor the terms of the lease itself, convert WJC into a state actor.  Similarly, the government does not, without more, become vicariously liable for the discretionary decisions of its lessee.  To apply the ruling in *Burton*, the private party's conduct of which the plaintiff complains must be inextricably intertwined with that of the government.  *See Brunette v. Humane Soc'y of Ventura Cty.*, 294 F.3d 1205, 1212–13 (9th Cir. 2002); *Vincent v. Trend W. Tech. Corp.*, 828 F.2d 563, 569 (9th Cir. 1987).  For the reasons set forth herein, we affirm the District Court's dismissal.

## I.  BACKGROUND

### A. The City acquires the Property and leases it to WJC

In 1988, the City sought to purchase from the United States Government real property located at 55-85 South Grand Avenue, Pasadena, California. (the "Property").  The purchase was contingent upon the approval of a leasing agreement between the City and WJC for the rehabilitation and use of the Property.  Among other things, the City intended to "provide increased and improved legal services to the citizens of Pasadena" and "provide a forum for educational research."

In 1989, the City purchased the Property and executed an agreement to lease it to WJC (the "Lease").**[2]**  The Lease described the relationship:

> [WJC] is entering into this Lease, rather than directly purchasing the Premises, because [WJC] does not qualify as an organization eligible to purchase the Premises [from the U.S. Government].  It is the intent that neither [the Pasadena Surplus Property Authority] nor the City of Pasadena shall be required to contribute general funds to the acquisition, restoration or renovation of the Premises, but nothing contained herein shall be construed as prohibiting or restricting the City against assisting [WJC] in applying to third parties for grants of funds to be used for restoring the Premises.  This Lease is not entered into as a commercial transaction by either party . . . .

The Lease required WJC to pay for all costs related to the acquisition, improvement, repair, and maintenance of the Property.  Indeed, the Lease specifically stated that the City shall "have no obligation, in any manner whatsoever, to repair and maintain the Premises nor the building located thereon nor the equipment therein, whether structural or non-structural."

---

**[2]** Initially, the Lease was between WJC and the Pasadena Surplus Property Authority, a public corporation formed by the City.  It was not until 1994 that the Authority transferred the Property to the City.  For purposes of this Opinion, however, we reference only the City.

The Lease also limited WJC's use of the Property to "non-profit law related functions," including:

> (i) operation of a center for the study of the following matters: alternative dispute resolution, administration of justice, delivery of legal services, and other legally oriented issues; (ii) providing space to non-profit entities for legal seminars, meetings, conferences, hearing rooms, deposition rooms, arbitration rooms, law library, research space; (iii) residential and office facilities for legal researchers and scholars and ancillary services such as dining facilities; and (iv) for subleasing portions of the Premises to tax exempt organizations providing law related services, and for no other purposes whatsoever.

Although the Lease required WJC to "use the [Property] for these purposes during ordinary business hours," it also stated that WJC was not precluded from "using the [Property] for community meetings and other purposes during non-business hours." Critically, the City asserts that it "derives no income, revenue or other financial benefit on account of [WJC]'s rental of meeting rooms" and "has no input or control over the entities to which [WJC] may rent its meeting rooms . . . during the evening hours."

In 1994, the City agreed to lend to WJC up to $458,000 for further rehabilitation of the Property. WJC has repaid those loans (and accrued interest thereon) in full through rental payments to the City. WJC currently pays to the City $1 per month in rent.

## B. WJC rescinds the Club's rental for the scheduled speaking event

Prior to the planned event that gave rise to this litigation, the Club periodically rented event space for its meetings that occurred outside of normal business hours.  Consistent with that practice, the Club contracted with WJC to rent some space on the Property for a speaking event to occur on April 20, 2017.  Dr. John Eastman, former dean at the Chapman University School of Law and professor of constitutional law, was scheduled to speak during the event.

After reserving the space for April 20 but before the event had occurred, the Club attempted to reserve the space for an additional event to occur the following month.  The Executive Director of WJC, retired Los Angeles Superior Court Judge Judith Chirlin, informed the Club that WJC's Executive Committee had enacted a new policy to "not make the [Property] available for rental to political groups—one side or the other."  WJC enacted this new policy "because of the heightened political rancor these days, and because it is the mission of [WJC] to promote peaceful conflict resolution and reduce prejudice and intergroup conflict."  The Club was told that WJC would honor the Club's rental for April 20, but would not rent to the Club thereafter.

Notwithstanding the pledge to honor its commitment, on the very afternoon of April 20, Judge Chirlin informed the Club that WJC would not allow the scheduled speaking event to take place on the Property later that same evening:

> It is with regret that I inform you that [the Club] cannot use our facilities for your meeting tonight.  While I knew that Prof Eastman was a professor and author, we learned just today that he is the President of

the National Organization for Marriage (NOM). NOM's positions on same-sex marriage, gay adoption, and transgender rights are antithetical to the values of [WJC]. [WJC] exists to build a more civil, peaceful society where differences among people are valued. WJC works to improve campus climates with a special focus on LGBT bias and bullying. We work to make sure that people recognize and stop LGBT bullying. Through these efforts we have built a valuable reputation in the community, and allowing your event in our facility would hurt our reputation in the community.

We will return the fee that you have paid immediately.

## C.  Procedural history

In November 2018, the Club filed this action against WJC, Judge Chirlin, and the City. Relying on § 1983, the Club alleges that all defendants discriminated against the Club's political viewpoints and religious beliefs in violation of the First Amendment. Additionally, under 42 U.S.C. § 1985(3), the Club alleges that Judge Chirlin conspired to violate the Club's First Amendment rights.

In May 2019, WJC and Judge Chirlin moved to dismiss the claims under Rule 12(b)(6) of the Federal Rules of Civil Procedure, and the City moved for summary judgment. The District Court granted both motions. For purposes of this appeal, the District Court held that the operative complaint does not plausibly allege that either WJC or Judge Chirlin acted "under color of state law" pursuant to the "joint action"

or "symbiotic relationship" test found in *Burton*.    The District Court also held that the undisputed facts show that the City did not delegate to WJC any final policy-making authority of the City that caused the Club's alleged constitutional violation.  The Club timely appeals from this decision.

## II.  JURISDICTION AND STANDARD OF REVIEW

We have jurisdiction pursuant to 28 U.S.C. § 1291.

We review *de novo* a district court's decision to grant a motion to dismiss.  "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim for relief that is plausible on its face." *Caviness v. Horizon Cmty. Learning Ctr., Inc.*, 590 F.3d 806, 812 (9th Cir. 2010) (internal quotation marks omitted).  "A claim has facial plausibility when the plaintiff pleads the factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (internal quotation marks omitted).

We also review *de novo* a district court's decision to grant a motion for summary judgment.  *See Balint v. Carson City*, 180 F.3d 1047, 1050 (9th Cir. 1999) (en banc).  In doing so, we do not weigh the evidence but, rather, determine whether there is a genuine issue of material fact. *See id.*

## III.    MOTION TO DISMISS

### A.  The Club's § 1983 claims against WJC and Judge Chirlin

Title 42 U.S.C. § 1983 provides that "[e]very person who, *under color of any statute, ordinance, regulation,*

*custom, or usage, of any State* . . . subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and the laws, shall be liable to the party injured in an action at law" (emphasis added).  "The ultimate issue in determining whether a person is subject to suit under § 1983 is the same question posed in cases arising under the Fourteenth Amendment: is the alleged infringement of federal rights fairly attributable to the [government]?" *Sutton v. Providence St. Joseph Med. Ctr.*, 192 F.3d 826, 835 (9th Cir. 1999) (quoting *Rendell-Baker v. Kohn*, 457 U.S. 830, 838 (1982)); *see also Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 935 n.18 (1982) (noting that "conduct satisfying the state-action requirement of the Fourteenth Amendment [also] satisfies the [§ 1983] statutory requirement of action under color of state law").

### 1.  State action under *Burton* and its progeny

"The determination of whether a nominally private person or corporation acts under color of state law 'is a matter of normative judgment, and the criteria lack rigid simplicity.'"   *Rawson v. Recovery Innovations, Inc.*, 975 F.3d 742, 747 (9th Cir. 2020) (quoting *Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 295–96 (2001)).   Courts must engage in "sifting facts and weighing circumstances" to answer what is "necessarily a fact-bound inquiry." *Lugar*, 457 U.S. at 939.  Indeed, "[no] one fact can function as a necessary condition across the board . . . nor is any set of circumstances absolutely sufficient." *Lee v. Katz*, 276 F.3d 550, 554 (9th Cir. 2002) (quoting *Brentwood Acad.*, 531 U.S. at 295–96).

The Supreme Court has developed four different tests that "aid us in identifying state action: '(1) public function; (2) joint action; (3) governmental compulsion or coercion;

and (4) governmental nexus.'"  *Rawson*, 975 F.3d at 747 (quoting *Kirtley v. Rainey*, 326 F.3d 1088, 1092 (9th Cir. 2003)).  The "[s]atisfaction of any one test is sufficient to find state action," but "[a]t bottom, the inquiry is always whether the defendant has exercised power possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law."  *Id.* at 747–48 (internal citations omitted).

Here, the Club relies exclusively on the "joint action" or "symbiotic relationship" test.[3]  The test asks "whether the government has so far insinuated itself into a position of interdependence with a private entity that the private entity must be recognized as a joint participant in the challenged activity."  *Brunette*, 294 F.3d at 1210.  A private entity may be considered a state actor "only if its particular actions are 'inextricably intertwined' with those of the government."  *Id.* at 1211.

In *Burton*, the progenitor of this test, a state parking authority acquired land to construct a public parking garage. 365 U.S. at 718.  Before construction began, however, the parking authority learned that the anticipated revenue from the garage would not be sufficient to finance its purchase, construction, or operations.  *Id.* at 719.  To secure additional monies, the parking authority executed long-term leases with commercial tenants.  *Id.*  The leasing agreements required the parking authority to pay the cost of the tenants' utilities,

---

[3] We therefore need not decide if any other state-action test applies. *See Harvey v. Brewer*, 605 F.3d 1067, 1078 (9th Cir. 2010) (explaining that "a court will not pass upon a constitutional question if there is some other ground upon which the case may be disposed").

heat, maintenance, and repairs—all of which were paid for from public funds.  *Id.* at 720.

The Supreme Court held that one of the tenants, a restaurant that refused to serve customers based on their race, was a state actor because the parking authority was a joint participant in the tenant's operations and, thus, a joint participant in the tenant's discrimination.  *Id.* at 723–25.  The Court focused on the mutual benefits conferred from the relationship: the tenant transacted more business because its customers were afforded a convenient spot to park in the public garage, and that convenience had an effect of increasing the utilization (and revenue) for the garage.  *Id.* at 724.  Critically, the parking authority also depended on the tenant's rental payments for its financial success because the garage was not a self-sustaining facility.  *See id.*  In other words, the tenant's commercial operations "constituted a physically and financially integral and, indeed, indispensable part of the State's plan to operate its project as a self-sustaining unit."  *Id.* at 723–24.  In all, *Burton* teaches us that "substantial coordination" and "significant financial integration" between the private party and government are hallmarks of a symbiotic relationship.  *Brunette*, 294 F.3d at 1213.

Heeding the Supreme Court's own instruction to limit *Burton*'s holding to "the peculiar facts or circumstances present," *Burton*, 365 U.S. at 725–26, we have repeatedly distinguished *Burton* and declined to expand its applicability.  In *Vincent*, for instance, we held that a government contractor performing maintenance services at an Air Force base was not a state actor because "the government did not profit from [the contractor]'s alleged unconstitutional conduct."  828 F.2d at 569–70.  "While [the contractor] may have been dependent economically on its

contract with the Air Force, [the contractor] was most certainly not an indispensable element in the Air Force's financial success." *Id.* at 569. We, therefore, found "no significant financial 'integration' between [the contractor] and the Air Force." *Id.*; *see also Brunette*, 294 F.3d at 1213–14 (holding that there was no symbiotic relationship where a private news company accompanied a "quasi-public" Humane Society in executing a search warrant of a breeder's ranch because plaintiff failed to allege that the news company "rendered any service indispensable to the Humane Society's continued financial viability").

That is not to say that *Burton* is not binding precedent. Recently, in *Rawson v. Recovery Innovations, Inc.*, we concluded that a private nonprofit hospital was a state actor. There, a patient sought to hold a private hospital and its doctors liable for petitioning a state court to commit him involuntarily to hospital custody and forcibly injecting him with antipsychotic medications. *Rawson*, 975 F.3d at 747. Noting that "*Burton* remains instructive," we held that the § 1983 claims survived summary judgment because the private hospital operated its facility on the same grounds as the state's main psychiatric hospital. *Id.* at 745–46. Not only did the private hospital lease its facility from the state, but the grounds were "recognizable" and "clearly marked as a state hospital." *Id.* at 756. Further entangling the two, the private hospital's medical director was also a full-time physician at the state hospital. *Id.* at 746. We considered this particular leasehold relationship only one of several factors weighing in favor of finding state action.[4]  We

---

[4] Indeed, we "consider[ed] the full factual context" in *Rawson*, observing numerous factors weighing in favor of finding state action, such as (1) the private hospital "exercise[d] powers traditionally held by the state" by detaining and forcibly treating Rawson to "protect[] both

ultimately concluded that the state had "undertaken a complex and deeply intertwined process [with private actors] of evaluating and detaining individuals for long-term [involuntary] commitments, and therefore, the state has so deeply insinuated itself into this process that [the private actors'] conduct constituted state action." *Id.* at 757 (internal quotation marks omitted) (alterations in original).

### 2.   WCJ and the City lack the significant degree of integration, dependency, and coordination that was apparent in *Burton*

Applying the principles distilled from *Burton* and its progeny, we cannot find state action here.  First, WJC and the City manage their operations independently of each other.  In *Burton*, the parking authority operated a parking garage in the same building as its commercial tenants and depended on those for-profit tenants for its initial financing and continued viability.  The parking authority relied on rental payments—the restaurant paid $28,700 per year—to defray the parking authority's own operating expenses because the parking garage was not a self-sustaining facility. In contrast, the Club does not allege that WJC helps to defray any operating expenses for the City.  Nor does the Club

---

the public and Rawson himself"; (2) the private hospital "perform[ed] actions under which the state owes constitutional obligations to those affected" by attempting to commit him involuntarily, thereby depriving Rawson of his liberty interests; (3) the state, through the county prosecutor, significantly involved itself and "played an outsized role" in the private hospital's decisionmaking to petition to commit Rawson involuntarily; (4) the state approved the private hospital's petition to commit Rawson involuntarily; and (5) the private hospital was "charged with applying state protocols and criteria in making evaluation and [involuntary] commitment recommendations."  *See Rawson*, 975 F.3d at 751–56.

allege that the City performs any City functions on the Property or that the City is responsible for any expenses related to the Property.  Indeed, all expenses related to the Property are paid directly by WJC, which is a self-sustaining organization itself.  *Cf. Rendell-Baker*, 457 U.S. at 842–43 (noting the salience in *Burton* that "the rent from the restaurant contributed to the support of the garage"); *Geneva Towers Tenants Org. v. Federated Mortg. Inv'rs*, 504 F.2d 483, 487 (9th Cir. 1974) (explaining that, in *Burton*, the "interdependence was principally financial" and the "rents paid by the shop partially defrayed the cost of the public facility and enhanced its success").

Although WJC borrowed money from the City to acquire and improve the Property, the Club does not allege that WJC and the City are financially integrated.  *Cf. Rendell-Baker*, 457 U.S. at 840 (holding that "receipt of public funds does not make [a private school's] discharge decisions acts of the State").  The Club does not allege that the City provided any capital to support WJC's operations, nor does the Club allege that the City provided any below-market interest rates.[5]  *Cf. Geneva Towers*, 504 F.2d at 487 (holding that there was interdependence where private parties invested in a public housing project and received below-market interest rates). On the contrary, the operative complaint acknowledges that WJC has reimbursed the City in full for all loans and accrued interest.

Indeed, the City distanced itself from WJC through the terms in the Lease.  Unlike in *Burton*—where the lease

---

[5] We do not mean to suggest that any one of those particular facts "function[s] as a necessary condition" or would be "absolutely sufficient" to establish that WJC acted under color state of law.  *Lee*, 276 F.3d at 554.

required the parking authority to pay its tenants' bills for utilities, heat, maintenance, and repairs—the Lease here does not require the City to cover any costs related to WJC or the Property. Instead, the Lease explicitly requires WJC to pay for its own utilities, operations, maintenance, and repairs. Also, unlike in *Rawson*—where a private hospital not only leased its facility from the state, but operated alongside the state hospital on the same campus that was "clearly marked as a state hospital," 975 F.3d at 756—the Club does not allege that the Property hosts any City-managed operations or that the Property is marked as City-owned land. And further unlike in *Rawson*, the Club does not allege that WJC and the City share any personnel. *See id.* at 746.

The Club suggested during oral argument that WJC's leasing arrangement with the City, alone, is enough to satisfy *Burton*. But merely contracting with the government does not transform an otherwise private party into a state actor. *See Rendell-Baker*, 457 U.S. at 840–41 (distinguishing *Burton* and explaining that "[a]cts of such private contractors do not become acts of government by reason of their significant or even total engagement in performing public contracts"); *Vincent*, 828 F.2d at 569–70 (distinguishing *Burton* and finding no state action where a contractor performed maintenance services at a U.S. Air Force base because "[t]here is no significant financial 'integration' between [the contractor] and the Air Force").

Moreover, the City does not profit financially from WJC's alleged discrimination. In *Burton*, the financial successes of the parking authority and its tenant were inextricably linked: an increase in the tenant's revenue achieved through the restaurant's business plan of racial discrimination (more customers, at least in 1961) correlated

with an increase in the parking authority's revenue (more cars parked). The parking authority's financial success also hinged on the tenant's success to the extent that the tenant could afford the critical rental payments, which subsidized the garage's operations. Therefore, the "profits earned by [the tenant's] discrimination not only contribute[d] to, but also [were] indispensable elements in, the financial success of [the] governmental agency." 365 U.S. at 724. But here, the City does not realize any share of the revenue earned from WJC's rental agreements. Regardless of however much WJC may profit from renting or refusing to rent event space, the City receives only $1 per month in rent. Thus, the Club fails to plead that WJC's nonprofit operations are indispensable to the City's continued viability. *Cf. Brunette*, 294 F.3d at 1213–14 (finding no symbiotic relationship because plaintiff failed to allege that the private news company "rendered any service indispensable to the Humane Society's continued financial viability"); *Vincent*, 828 F.2d at 569–70 (finding no symbiotic relationship because the contractor performing maintenance services at the Air Force base "was most certainly not an indispensable element in the Air Force's financial success").

Setting aside the fact that the City does not profit *financially* from WJC's alleged discrimination, the Club maintains that the City "profits" *intangibly* by allowing civic programs to operate in the City. The Club contends that WJC canceled the speaking event to preserve its reputation, which allowed WJC to continue carrying out its "non-profit law related functions," which in turn benefited the City and its citizens. But this contention expansively stretches *Burton* to capture the mere generic promotion of a public purpose— the principal goal of government writ large. Adopting this theory would cast almost any nonprofit with a civic mission and some contractual relationship with the government as a

state actor.  The City certainly derives *some* benefit insofar as its citizens benefit from WJC's "study of dispute resolution and the administration of justice."  But "any exchange of mutual benefits . . . falls far short of creating the substantial interdependence legally required to create a symbiotic relationship."  *Brunette*, 294 F.3d at 1214.

Finally, the City's involvement in WJC's alleged discrimination is nowhere near the requisite degree of "substantial cooperation" mentioned in *Burton*.  The City did not participate in, or know in advance about, the initiation or the cancellation of the Club's speaking event.  In fact, the City did not even learn about the incident until the Club filed the complaint in this case.  The Club fails to allege that the City "significantly involve[d] itself in the private parties' actions and decisionmaking at issue."  *Rawson*, 975 F.3d at 753; *see also Brunette*, 294 F.3d at 1212 (finding that a private party and a "quasi-public" entity "acted independently" where neither "assisted the other in performance of its separate and respective task" nor participated in the other's preparatory meetings before the alleged constitutional violation).

In all, WJC and its agents were not state actors for purposes of the Club's § 1983 claims.  The Club fails to allege that the City has "undertaken a complex and deeply intertwined process" with WJC to discriminate against the Club by canceling its speaking event.  *Rawson*, 975 F.3d at 757 (internal citation omitted).  The Club also fails to allege that the City "has so deeply insinuated itself into this process that [WJC's] conduct constituted state action."  *Id.* (internal citation omitted).  Accordingly, we affirm the District Court's dismissals.

## B.  The Club's § 1985(3) claim against Judge Chirlin

While § 1983 provides a cause of action if *one* person deprives an individual of his constitutional rights, § 1985(3) provides a cause of action if *two or more* persons conspire to deprive an individual of his constitutional rights.  Like § 1983, which requires the wrongdoer to be a state actor, § 1985(3) requires at least one of the wrongdoers in the alleged conspiracy to be a state actor.  Indeed, the Supreme Court has held that "an alleged conspiracy to infringe First Amendment rights is not a violation of § 1985(3) unless it is proved that the State is involved in the conspiracy."  *United Bhd. of Carpenters & Joiners, Local 610 v. Scott*, 463 U.S. 825, 830 (1983).

Here, however, the Club fails to allege that a state actor participated in the alleged conspiracy.  The Club alleges only that Judge Chirlin "conspired with members of the staff and executive committee of [WJC] to deprive [the Club] and its members of civil rights."  The Club attempts to sidestep the state-action requirement by arguing that WJC itself is a state actor, but for the same reasons described above, this argument fails as to WJC and its agents.  Because WJC and its agents are not state actors, and because the Club does not allege that the City or some other state actor participated in the alleged conspiracy, the Club fails to state a claim under § 1985(3).

## IV.    SUMMARY JUDGMENT

A municipality may be sued for constitutional violations under § 1983, but "claims cannot predicate municipal liability for constitutional violations of its officers under the theory of respondeat superior."  *Lockett v. Cty. of L.A.*, 977 F.3d 737, 741 (9th Cir. 2020) (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978)).  To establish *Monell*

liability under § 1983, the constitutional violation must be caused by a municipality's "policy, practice, or custom" or be ordered by a policy-making official.  *See Dougherty v. City of Covina*, 654 F.3d 892, 900 (9th Cir. 2011); *Gibson v. Cty. of Washoe*, 290 F.3d 1175, 1185–86 (9th Cir. 2002), *overruled on other grounds by Castro v. Cty. of L.A.*, 833 F.3d 1060, 1076 (9th Cir. 2016).

The Club argues that the City is liable for WJC's alleged constitutional violation because the City delegated final policy-making authority when it leased the Property to WJC. Through the terms in the Lease, the Club argues, the City delegated complete discretion over whether and to whom the Property could be rented during nonbusiness hours. Therefore, WJC's refusal to rent the Property to political groups and its subsequent cancellation of the Club's speaking event constituted "an act of official governmental policy."  The Club seems to suggest that we should infer delegation—and thus liability—from the mere fact that a private party rented out space on the property that it had leased from the government.

Although it is true that the Lease did not prohibit WJC from renting out event space during nonbusiness hours, a permissive lease covenant does not convert discretion into delegation, even when that discretion rests with a public official.  *See Pembaur v. City of Cincinnati*, 475 U.S. 469, 481–84 (1986) (plurality opinion) ("The fact that a particular official—even a policymaking official—has discretion in the exercise of particular functions does not, without more, give rise to municipal liability based on an exercise of that discretion.").  And even more so here.  When the City executed the Lease, it was not delegating final policy-making authority on political speaking events in the City; it was simply conveying a property interest—the right of

occupancy—in the premises.  WJC maintained the authority to decide who, when, for what reason, and for how long a visitor could occupy the premises during nonbusiness hours. Therefore, when WJC executed—and rescinded—the rental agreement with the Club, WJC was exercising its discretionary authority on its own behalf as the holder of a possessory interest in the Property.  WJC was not exercising any "policymaking authority for a particular city function" on behalf of the City.  *Hammond v. Cty. of Madera*, 859 F.2d 797, 802 (9th Cir. 1988), *abrogated on other grounds as stated in L.W. v. Grubbs*, 92 F.3d 894, 897–98 (9th Cir. 1996).  "[T]he fact that the government licenses, contracts with, or grants a monopoly to a private entity does not convert the private entity into a state actor—unless the private entity is performing a traditional, exclusive public function."  *Manhattan Cmty. Access Corp. v. Halleck*, 139 S. Ct. 1921, 1931–33 (2019) (holding that the private operator of a public access channel was not a state actor).  And, of course, there is no claim that renting out event space during nonbusiness hours is a "traditional, exclusive public function."  The government does not, without more, become vicariously liable for the discretionary decisions of its lessee. Accordingly, the undisputed facts show that the City did not delegate any final policy-making authority that caused the Club's alleged constitutional injury.

**AFFIRMED.**